**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOE BALTAS,<br>Plaintiff,<br><br>v.<br><br>B. FITZGERALD, et al.,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>: | <br>CASE NO. 3:21-cv-587 (MPS)<br><br><br><br><br>September 24, 2026 |

**MEMORANDUM OF DECISION ON**
**MOTION FOR SUMMARY JUDGMENT**

Lieutenant Brent Fitzgerald, Warden Stephen Faucher, and Nurse Janine Brennan ("the defendants") have filed a motion for summary judgment, ECF No. 120, accompanied by a supporting memorandum, ECF No. 120-1, a Local Rule 56(a)1 statement, ECF No. 120-2, and various exhibits. ECF Nos. 121-1, 121-2, 122-1–122-10, 123-1–123-10, 124, 125, 126. Joe Baltas, the plaintiff, has filed a memorandum in response to the defendants' motion, ECF No. 199-1, a Local Rule 56(a)2 statement, ECF No. 200, and various exhibits. ECF Nos. 199, 204. The defendants have filed a reply. ECF No. 213.

For the following reasons, the defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

Baltas filed this civil rights action against the State of Connecticut and ten Department of Correction ("DOC") employees. ECF No. 1 ¶¶ 10–20. I reviewed that complaint under 28 U.S.C. § 1915A(a). *See* ECF No. 27. After doing so, I permitted Baltas to pursue: (1) Eighth Amendment claims based on isolating conditions and lack of exercise against Fitzgerald and Faucher; (2) Eighth Amendment harassment claims against Fitzgerald based on his orders to impose increased searches and restrictions on Baltas; (3) Eighth Amendment failure to protect claims against

Faucher; (4) Eighth Amendment medical indifference claims against Fitzgerald, Faucher, and Brennan; (5) Fourteenth Amendment equal protection claims against Fitzgerald; (6) First Amendment retaliation claims against Fitzgerald, Faucher, and Brennan; and (7) First Amendment Free Exercise claims against Fitzgerald and Faucher. ECF No. 27 at 53. I dismissed all other claims. *Id.* at 53–54.

The defendants have now moved for summary judgment on all remaining claims. *See* ECF No. 120 at 1. The defendants argue: (1) that Baltas failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"); (2) that Baltas's claims fail on the merits; and (3) that the defendants are entitled to qualified immunity. *Id.*

After thoroughly considering the voluminous materials submitted by the parties, I agree with the defendants that Baltas's Eighth Amendment, Fourteenth Amendment, and First Amendment Free Exercise claims either fail on the merits or that the defendants are entitled to qualified immunity on such claims. But I disagree that all of Baltas's First Amendment retaliation claims fail on the merits or that all the defendants are entitled to qualified immunity on such claims. And although I agree with the defendants that Baltas failed to exhaust his administrative remedies on his First Amendment retaliation claims, I conclude that administrative remedies were unavailable to Baltas. Accordingly, I grant the defendants' motion for summary judgment in part and deny that motion in part for the reasons stated below.

## II. LOCAL RULE 56

"On summary judgment, courts are tasked with determining whether the movant has shown that there is no genuine dispute as to any material fact and is entitled to judgment as a matter of law." *Clark v. Hanley*, 89 F.4th 78, 95 (2d Cir. 2023) (cleaned up) (quoting Fed. R. Civ. P. 56(a)).

Rule 56, however, "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). Rather, district courts are permitted to promulgate and enforce local rules that assist the court in identifying factual disputes in the record. *See Frantti v. New York*, 850 F. App'x 17, 19 (2d Cir. 2021) (summary order) (the Second Circuit has "held that district courts have 'considerable latitude to fashion rules that will assist them in determining whether summary judgment is appropriate.'" (brackets omitted) (quoting *Amnesty America*, 288 F.3d at 471). Local Rule 56 is one such rule. *See Coger v. Connecticut,* 309 F. Supp. 2d 274, 277 (D. Conn. 2004). ("The purpose of [Local] Rule 56 is to aid the court, by directing it to the material facts that the movant claims are undisputed and that the party opposing the motion claims are disputed.").

Both parties have failed to abide by Local Rule 56(a) and its subparts. But a district court has "broad discretion" both to "overlook a party's failure to comply with local rules," *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 109 n.2 (2d Cir. 2006) (internal quotation marks and citation omitted), and "in choosing whether to admit evidence" on summary judgment. *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 264 (2d Cir. 2009) (internal quotation marks and citation omitted). Accordingly, I will overlook the parties' failures to comply with Rule 56(a) and its subparts when these failures do not interfere with my ability to determine whether a genuine dispute of material fact exists based on admissible evidence. *See Bellamy v. City of New York*, 914 F.3d 727, 750 (2d Cir. 2019) (noting that it is "axiomatic that, when reviewing a summary judgment determination, [a court] may only consider admissible evidence."). But the parties' failures will have consequences—such as my not considering certain evidence or finding certain facts to be admitted—when they interfere with my ability to do so. *See*, *e.g.*, D. Conn. L.

Civ. R. 56(a)3 (permitting court to "impos[e] sanctions" when a party "[f]ails to provide specific citations to evidence in the record as required by this Local Rule….").

**A. Deficiencies in the defendants' Local Rule 56(a)1 statement**

The defendants Local Rule 56(a)1 statement totals thirty-two pages, excluding the certification page. *See* ECF No. 120-2. Baltas, who filed a 272-paragraph complaint containing fifteen causes of action against eleven defendants, *see generally* ECF No. 1, objected to the defendants' Rule 56(a)1 statement because it exceeded the number of pages allowed by Local Rule 56(a)1. *See* ECF No. 202. After Baltas filed his objection, the defendants moved for leave to file their overlong Rule 56(a)1 statement *nunc pro tunc*. ECF No. 205. Because the defendants' overlong Rule 56(a)1 statement will neither impede my ability to determine whether summary judgment should be granted nor prejudice Baltas, given the length of his own submissions, I find "good cause" to permit the defendants to file an overlong Local Rule 56(a)1 statement. D. Conn. L. Civ. R. 56(a)1. Accordingly, the defendants' motion for leave to file excess pages in its statement of material facts, ECF No. 205, is **GRANTED**.

Some of the content of the defendants' Rule 56(a)1 statement, however, will impede my ability to determine whether summary judgment should be granted. For instance, the defendants' Rule 56(a)1 statement contains facts that are not "material to the decision of the motion." D. Conn. L. Civ. R. 56(a)1; *see also*, *e.g.*, ECF No. 120-2 ¶ 6 (noting that Baltas has "been convicted of [m]urder."); *id.* ¶ 10 (noting the number of disciplinary tickets Baltas has received from 2006 to 2023). The Rule 56(a)1 statement also contains conclusions stated as facts. *See*, *e.g.*, *id.* ¶ 32 ("The denial of the Health Services Review was appropriate…."); *id.* ¶ 80 ("The issuance of disciplinary tickets was in response to [Baltas's] continuation to disobey institutional rules and not imposed for

purposes of harassment, punishment or the deprivation of constitutional rights."). I will not rely on any immaterial facts or conclusory assertions contained in the defendants' Rule 56(a)1 statement. *See* D. Conn. L. Civ. R. 56(a)1 ("The Local Rule 56(a)1 Statement should include only those facts that are material to the decision of the motion."); *Sce v. City of New York*, No. 20-3954-CV, 2022 WL 598974, at *1 n.4 (2d Cir. Mar. 1, 2022) (summary order) (noting that a "conclusory assertion … does not create a genuine dispute of fact.").

In addition, Baltas objects to the defendants' Local Rule 56(a)1 statement because the declarations supporting it do not cite the "specific page numbers" of "any referenced document." ECF No. 199-1 at 5. But the Local Rules' "specific citation" requirement applies to the Rule 56(a)1 statement itself, not the declarations supporting it. *See* D. Conn. L. Civ. R. 56(a)3 ("Each statement of material fact by a movant *in a Local Rule 56(a)1 Statement* or by an opponent *in a Local Rule 56(a)2 Statement*, and each denial *in an opponent's Local Rule 56(a)2 Statement*, must be followed by a specific citation…." (emphasis added)). Accordingly, this objection is overruled.

Baltas also objects to the defendants' relying on affidavits from witnesses that the defendants did not identify in their initial disclosures. *See* ECF No. 199-1 at 4; ECF No. 199 at 607. The Federal Rules of Civil Procedure provide that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). But "even if a party does not comply with Rule 37(c)(1), automatic preclusion for undisclosed evidence is still considered a drastic remedy and will apply only in situations where the failure to disclose represents a flagrant

bad faith and callous disregard for the rules." *Bhagwant v. Kent Sch. Corp.*, 453 F. Supp. 2d 444, 448 (D. Conn. 2006) (internal quotation marks and citation omitted).

Here, the defendants disclosed the three defendants and an "Administrative Remedy Coordinator assigned to Corrigan-Radgowski Correctional Center" as potential witnesses. ECF No. 199 at 607. The defendants' disclosure also stated that they "reserve[d] the right to supplement this list as discovery unfolds." *Id.* Baltas takes issue with the defendants' submitting affidavits from Michelle Deveau and Felicia Hensch in support of their summary judgment motion without disclosing them as witnesses before filing the motion. *See* ECF No. 199-1 at 4. According to their affidavits, Deveau is a "Records Specialist II" employed by DOC, ECF No. 121-1 ¶¶ 2–3, and Hensch is the "Litigation Liaison for Corrigan Correctional Center." ECF No. 122-7 ¶ 2. Both witnesses merely provide information related to Baltas's DOC records, *see generally* ECF No. 121-1; ECF No. 122-7, just as an "Administrative Remedy Coordinator assigned to Corrigan-Radgowski Correctional Center," ECF No. 199 at 607, would—and did—provide. *See*, *e.g.*, ECF No. 121-2 at 2–7 (declaration from Nicholas Jacarcuso, the "Administrative Remedies Coordinator at Corrigan," *id.* ¶ 3, providing such information).

Because Deveau and Hensch's affidavits serve the same purpose as Jacarcuso's affidavit, I cannot conclude that the defendants' failure to disclose these witnesses prior to summary judgment "represents a flagrant bad faith and callous disregard for the rules." *Bhagwant*, 453 F. Supp. 2d at 448; *see also Palma v. Pharmedica Commc'ns, Inc.*, No. CIV.3:00CV1128 (AHN), 2002 WL 32093275, at *2–3 (D. Conn. Mar. 27, 2002) (declining to strike affidavits that were not disclosed to plaintiff until summary judgment because it was "likely that the documents were created solely to support the summary judgment motion and would not have existed but for that

motion" and because the plaintiff "deposed the affiants and had a full opportunity to explore the facts known to each.").

Although Baltas would not have been able to depose Deveau and Hensch during discovery, like the plaintiff was able to do in *Palma*, Baltas could have obtained the same information by deposing Jacarcuso. Thus, I conclude, as the *Palma* court did, that "[t]his does not appear to be a situation where the defendant was withholding documents in order to ambush the plaintiff," and that exclusion of Deveau and Hensch's affidavits would be improper under Rule 37(c)(1). *See Palma*, 2002 WL 32093275, at *2–3. Accordingly, this objection is also overruled.

Lastly, Baltas objects to the defendants' "convoluted, disorganized[,] and confusing" submissions. ECF No. 199-1 at 5. I agree with Baltas that the defendants could have better organized their submissions, but the submissions are not so disorganized that I am unable to locate the "(1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." D. Conn. L. Civ. R. 56(a)3. Accordingly, this objection is overruled, too.

### B. Deficiencies in Baltas's Local Rule 56(a)2 statement

The Local Rules apply equally to Baltas, even though he is self-represented. *See*, *e.g.*, *Cavienss v. Norwalk Transit*, No. 3:21-CV-01694 (MPS), 2025 WL 1411414, at *3 (D. Conn. May 15, 2025) ("Self-represented litigants are not absolved of their obligation to file a Rule 56(a)2 statement." (internal quotation marks and citation omitted)).[1] A Local Rule 56(a)2 statement must

[1] Baltas is an experienced litigant in this Court, having filed some fifteen cases here and having defended summary judgment motions (often at least partially successfully) many times. He has also ably represented himself in hearings before the Court. While this point is not dispositive of any issue here, I may apply a lessened degree of solicitude to his pleadings and briefs than the one I would apply to a *pro se* litigant with no significant litigation experience. *See Ceccarelli v. Morgan Stanley Private Bank N.A.*, 763 F.Supp.3d 550, 557-58 (S.D.N.Y. 2025).

"include a reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c)." D. Conn. L. Civ. R. 56(a)2(i). But Baltas's Local Rule 56(a)2 statement adheres to this requirement for only fifteen paragraphs. *See* ECF No. 200 ¶¶ 1–15.

The remainder of Baltas's Local Rule 56(a)2 statement fails to comply with Rule 56(a)2 because it does not contain "a reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement," D. Conn. L. Civ. R. 56(a)2(i), as required by the Local Rules. *See, e.g. Mmolawa v. Diligent Enters., Inc.*, No. 19-CR-300 (VLB), 2020 WL 7190819, at *1 (D. Conn. Dec. 7, 2020) (concluding that Local Rule 56(a)2 statement was non-compliant because it "d[id] not 'include a reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement.'" (ellipses omitted) (quoting D. Conn. L. Civ. R. 56(a)2(i))). Although some courts have "cit[ed] only to the defendants' Rule 56(a)1 Statement" when a Local Rule 56(a)2 statement is deficient for this reason, *see*, *e.g.*, *Floyd v. Dirga*, No. 3:20-CV-00070 (JCH), 2023 WL 112827, at *1 n.1 (D. Conn. Jan. 5, 2023), I will overlook this failure to comply with Local Rule 56(a)2 because it does not impede my ability to determine whether a genuine dispute of material fact exists based on admissible evidence.

But Baltas's Rule 56(a)2 statement fails to comply with Local Rule 56(a) and its subparts in other ways that I cannot overlook. For instance, Baltas's Rule 56(a)2 statement fails to comply with Local Rule 56(a)3's "specific citation obligation," which requires that "each denial in an opponent's Local Rule 56(a)2 Statement[ ] must be followed by a specific citation to (1) the

affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." D. Conn. L. Civ. R. 56(a)3 (internal quotation marks and comma omitted).

Such rules are "necessary to expedite the retrieval, review and analysis of the content of relevant exhibits," *Mmolawa*, 2020 WL 7190819, at *1, so that courts need not "hunt through voluminous records without guidance from the parties." *Frantti*, 850 F. App'x at 19 (internal quotation marks and citation omitted). A party's "failure to comply with these rules unnecessarily taxes the Court's resources and delays disposition of the related motion." *Mmolawa*, 2020 WL 7190819, at *1. The "[f]ailure [of a party] to provide specific citations to evidence in the record as required by [Local Rule 56(a)3] may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions[.]" D. Conn. L. Civ. R. 56(a)3.

Despite the defendants' warning Baltas of Local Rule 56(a)'s requirements, *see* ECF No. 121-3 (Local Rule 56(b) notice), Baltas's Rule 56(a)2 statement is replete with denials that are not "followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." D. Conn. L. Civ. R. 56(a)3; *see also*, *e.g.*, ECF No. 200 ¶ 6 (denying that Baltas's conviction or confinement is "lawful" without citing any evidence to substantiate this assertion). Because this impedes my ability to determine whether a genuine dispute of material fact exists based on admissible evidence, any fact in the defendants' Local Rule 56(a)1 statement met with an unsupported denial will be deemed admitted. *See* D. Conn. L. Civ. R. 56(a)3; *see also*, *e.g.*, *Devecchis v. Scalora*, 179 F. Supp. 3d 208, 216 n.7 (D. Conn. 2016) (deeming fact in Rule 56(a)1 statement admitted because plaintiff "d[id] not cite anywhere in the record to support her denial[.]").

Other content in Baltas's Local Rule 56(a)2 statement equally prevents me from expeditiously and fairly deciding this motion. For instance, instead of using his Rule 56(a)2 statement to point to admissible evidence that may create a genuine dispute of material fact, Baltas often provides improper objections, commentary, or argument. *See*, *e.g.*, ECF No. 200 ¶ 10 (stating that "the period of time after Sept. 2022 is not relevant [to] this action in any way, nor is [Baltas's] disciplinary history preceding the allegations of the Complaint in 2022."); *id.* ¶ 11 (stating that the "sanctions listed are not accurate, nor are they relevant to this action.").

But "[a] Rule 56(a)2 Statement is not a proper vehicle to 'object' to the purported materiality of the fact." *Nqadolo v. Care at Home, LLC*, No. 3:22-CV-612 (KAD), 2025 WL 2432612, at *2 n.3 (D. Conn. Aug. 22, 2025) (citing D. Conn. L. Civ. R. 56(a)2(i) (citing Fed. R. Civ. P. 56(c))). Nor is a Rule 56(a)2 statement a proper vehicle to "insert improper qualifications, assert blanket denials, and/or inject additional information in order to deflect and obfuscate." *Hodnett v. Medalist Partners Opportunity Master Fund II-A, L.P.*, No. 1:21-CV-00038 (JLR), 2025 WL 2607548, at *2 (S.D.N.Y. Sept. 9, 2025) (cleaned up).

Accordingly, I will not address any improper objections, commentary, or argument contained in Baltas's Rule 56(a)2 statement, *see Mongiello v. City of New Rochelle*, No. 24-CV-4842 (CS), 2026 WL 986297, at *1 n.2 (S.D.N.Y. Apr. 13, 2026) ("disregard[ing]" such responses), nor will such objections or denials create a genuine dispute of fact. On the other hand, if I "deem[ ] any cited evidence inadmissible" I will "exercise [my] broad discretion and simply ignore those paragraphs" in the defendants' Local Rule 56(a)1 statement. *Hodnett*, 2025 WL 2607548, at *2 (cleaned up).

In light of the above, I rely on and recite below material, non-conclusory facts from the defendants' Rule 56(a)1 statement, ECF No. 120-2, from Baltas's statement of additional material facts contained in his Rule 56(a)2 statement, ECF No. 200 at 26–33, and from the record, including facts from Baltas's verified complaint that are not contradicted by the record. *See Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) ("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit described in Rule 56(c)(4)." (internal quotation marks and citation omitted)).

I will not rely on any facts submitted in Baltas's Local Rule 56(a)1 statement (ECF No. 201) supporting his cross-motion for summary judgment, *see* ECF No. 201, because I have already denied that motion as untimely. *See* ECF No. 208. Finally, I will not "hunt through voluminous records without guidance from the parties," *Frantti*, 850 F. App'x at 19 (internal quotation marks and citation omitted), "to consider what the parties fail to point out." *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (internal quotation marks and citation omitted). With that said, I will consider the following facts in deciding the defendants' motion.

## III. FACTUAL BACKGROUND

Baltas is serving a prison sentence in the DOC. *See* ECF No. 120-2 ¶ 6. Prison officials placed Baltas on "Chronic Discipline" status on April 20, 2018. *Id.* ¶ 12. "Chronic Discipline" is, according to the DOC Administrative Directive then in place, "a restrictive housing status that resulted in management of any inmate whose behavior, while incarcerated, posed a threat to the security and orderly operation of a facility, or a risk to the safety o[f] staff or other inmates due to repetitive disciplinary infractions." *Id.* ¶ 51. Chronic Discipline inmates were:

> [S]ubjected to restrictions of movement out of the unit; subjected to 15 minute in cell observation; subject[ed] to out-of- cell restraint status; subjected to cell searches not less frequently than once every seven (7) days; subjected to security checks; permitted a minimum of three (3) showers per week with a 15-minute out of cell limit; obtained one of their three meals per day on the tier; could participate in limited work assignments; permitted one (1) hour per day five days a week of recreation; permitted to posses[s] property in accordance with Administrative Directive 6.10; subjected to a weekly spending limit of $35 for commissary purchases; able to send and receive mail same as general population; permitted use of a Walkman and earplugs; not permitted to possess a tv; limited to [two] 15-minute phone calls per week if not on any sanctions prohibiting telephone calls and allowed two 30-minute non-contact visits per week.

*Id.* ¶ 52. Moreover, as a Chronic Discipline inmate, Baltas was "confined to [his] cell[ ] 23 hours a day, in accordance with Administrative Directive 9.4." *Id.* ¶ 86. Because Faucher was merely the warden, he "did not have the authority to make changes to [DOC] Administrative Directives." *Id.* ¶ 55. Only the DOC Commissioner could make such changes. *Id.* Unit Supervisors (also known as lieutenants) were responsible for enforcing restrictions contained in the Administrative Directives in housing units containing Chronic Discipline inmates. *Id.* ¶¶ 47, 53.

On June 6, 2018, prison officials transferred Baltas to Corrigan-Radgowski Correctional Center ("Corrigan"). *See id.* ¶ 7. In 2018, Corrigan housed both pretrial and sentenced inmates, including inmates "with a history of violent tendencies" and inmates who belonged to a gang. *Id.* ¶ 49. Baltas was classified as "High Security, concurrent to Chronic Discipline" when prison officials transferred him to Corrigan. *Id.* ¶ 13. "High Security" is "a designation which provides for increased supervision of inmates who posed a threat to the safety and security of the facility, staff, inmates, or the public." *Id.* ¶ 54. Under the Administrative Directives, High Security inmates were to be "managed in accordance with general population standards with the following

exceptions: escorted or monitored movement only; cell searches, at a minimum of 2 times per week; in unit work assignments only; in unit or monitored [programs]; non-contact social visits only; mail retention, same as general population and automatic mail review; and telephones, same as general population and automatic call review." *Id.* High Security "c[ould] be used in conjunction with placement on any other restrictive status." *Id.*

Once Baltas arrived at Corrigan, prison officials placed him in the restrictive housing unit ("RHU") while Baltas awaited resolution of disciplinary tickets that he had received before transferring to Corrigan. *Id.* ¶ 12. Baltas remained in the RHU until prison officials transferred Baltas to A-Pod, where Phase II Chronic Discipline inmates were housed, on June 15, 2018. *Id.* ¶¶ 14, 50. While Baltas was held in A-Pod, prison officials managed him "in accordance with his classification – Chronic Discipline Interval II/High Security." *Id.* ¶ 75. Inmates like Baltas, who were classified as High Security and Chronic Discipline, could not be managed according to general population standards. *See id.* ¶ 94.

When Baltas entered A-Pod, he was subject to sanctions resulting from disciplinary tickets he had previously received at other prisons, in addition to the restrictions associated with his "High Security, concurrent to Chronic Discipline" status. *Id.* ¶¶ 11-13. For example, Baltas was serving a sanction for loss of telephone privileges from April 21, 2018, to July 19, 2018, and loss of recreation from May 21, 2018, to June 19, 2018, and from June 21, 2018, to July 20, 2018. *Id.* ¶ 11.

Baltas also began committing new disciplinary violations after arriving in A-Pod. On June 27, 2018, prison officials issued Baltas a disciplinary ticket for disobeying a direct order. *Id.* ¶ 8. That disciplinary ticket resulted in a loss of telephone privileges from November 18, 2018, to

December 17, 2018. *Id*. On July 19, 2018, prison officials issued Baltas another disciplinary ticket for falsely reporting an incident. *Id.* ¶ 9. As a result of this disciplinary ticket, prison officials placed Baltas in the RHU from July 19, 2018, to August 2, 2018; restricted Baltas's social visits from August 3, 2018, to October 1, 2018; and restricted Baltas's telephone privileges from December 18, 2018, to February 14, 2019. *Id.*

In addition to the restrictions stemming from Baltas's disciplinary violations and custody status, Baltas was also subject to other restrictions to which all Corrigan inmates were subject. When Baltas was at Corrigan, the facility "was subject to lockdown not only as a result of an incident within the facility involving inmates and staff, but also due to the need for required annual staff training," which took place weekly or monthly. *Id.* ¶ 63. This training affected all units within Corrigan. *Id.*

The 2018 Corrigan Handbook, provided to all inmates upon admission to the facility, permitted "collective religious activity" among Native Americans and adherents to certain other religions. *Id.* ¶¶ 59–60. The Handbook also permitted inmates among those groups to meet with clergy. *Id.* ¶ 60. But because Corrigan housed a mix of pretrial inmates, sentenced inmates, gang members, and inmates on Chronic Discipline, "a decision was made above the warden level that this facility would not contain a sweat lodge to be used by inmates who identified as Native American." *Id.* ¶ 58 (comma omitted).

Although Corrigan did not have a sweat lodge, *id.*, Corrigan officials permitted Native American inmates to "dry smudge in their cells[.]" *Id.* ¶ 62. In-cell dry smudging was "an alternative offered to those inmates who, because of institutional behavior, were not permitted to participate in smudging, which was to take place outside and involved the act of burning sacred

herbs for cleansing and purification." *Id.* Thus, "[t]he classification and disciplinary history of an inmate dictated whether an inmate c[ould] participate in smudging outside or participate in dry smudging in his cell." *Id.* ¶ 99. Because of Baltas's "classification and disciplinary history, only dry smudging would be available" to him in A-Pod. *Id.* Baltas was able to smudge while in the RHU from June 6, 2018, to September 6, 2018, and from September 11, 2018, to September 27, 2018. ECF No. 200 ¶ 142. But Fitzgerald and Faucher did not permit Baltas to smudge while he was in the A-Pod Unit. *Id.* ¶ 144. Baltas avers that chronic discipline inmates were permitted to smudge and he "was the only prisoner not permitted to smudge." ECF No. 1 ¶ 77.

Prison officials permitted Chronic Discipline inmates to "recreate and socialize with others" during specific times on weekdays. ECF No. 120-2 ¶ 67. During these times, Chronic Discipline inmates were permitted "to converse." *Id.*; *see also* ECF No. 200 ¶ 139. Although "inside recreation … was not a time for inmates to exercise," ECF No. 120-2 ¶ 67, Chronic Discipline inmates could "exercise, whether aerobic or anaerobic, in [their] cell[s]." *Id.* ¶ 86. Prison officials provided Baltas "with out of cell time for purposes of recreating, socializing, and maintaining contact with family, subject to sanctions he may have received from the receipt of disciplinary tickets." *Id.* ¶ 75; *see also* ECF No. 200 ¶ 139. But during "rec time," Baltas was unable to "move around, walk, watch TV, or use the phone." ECF No. 200 ¶ 137. While Baltas was in the RHU, his rec time took place "in a single person area" in which he had no human contact. *Id.* ¶ 138. Baltas's only opportunity for human contact was during the rec time he received while in A-Pod. *Id.* ¶ 139.

Corrigan also restricted the use of typewriters. Faucher approved a typewriter policy in 2017 "that specifically addressed the needs of inmates confined in the Corrigan and Radgowski

buildings." ECF No. 120-2 ¶ 69. This policy was in effect in 2018. *Id.* The Faucher-approved policy permitted inmates to use typewriters "for a set period of time absent need by others." *Id.* ¶ 82. Baltas "had access to a typewriter while confined in A-Pod." *Id.*

On June 27, 2018, Baltas went to the counselor's office to retrieve his typewriter. ECF No. 1 ¶¶ 56–57(a). Fitzgerald, who was in that office when Baltas arrived, asked Baltas "what he was using the typewriter for[.]" *Id.* ¶ 57(a). Baltas told Fitzgerald that he was using the typewriter to type up a lawsuit about "'all the shit wrong with this place.'" *Id.* Fitzgerald became "furious" at this, told Baltas that he had "already 'been warned,'" and that Fitzgerald would make Baltas's "'life hell.'" *Id.* Baltas told Fitzgerald that his life "'already is hell'" and then left the office. *Id.*

Fitzgerald "stormed out of the office" and told staff to "start the shakedowns" and "'tear through Baltas'[s] cell.'" *Id.* ¶ 57(b). Two officers then entered Baltas's cell while "another single officer conducted the other cell searches." *Id.* ¶ 58. The single officer "completed all three cell searches while the two officers in [Baltas's] cell continued to 'tear through' and destroy his living quarters." *Id.*[2] Fitzgerald smiled in the control room as he watched these officers search Baltas's cell. *Id.* ¶ 59. Fitzgerald later issued Baltas a "false" disciplinary report for "refusing to lock up…." *Id.* ¶ 71.

Baltas had a "pre-existing diagnosis of torn cartilage" and a cyst in his knee before arriving at Corrigan. ECF No. 200 ¶ 151. DOC medical records show that doctors prescribed Baltas knee braces in 2016 and 2017. See ECF No. 199 at 225, 227. Baltas also had a "pre-existing diagnosis for asthma" before arriving at Corrigan. ECF No. 200 ¶ 150. DOC medical records show that

[2] Baltas does not specify which other inmates' cells were searched.

"there was an active order for [Baltas] specific to an inhaler … for the period [of] March 12, 2018[,] through August 31, 2018." ECF No. 120-2 ¶ 41.

On June 19, 2018, Baltas spoke with Lieutenant Fitzgerald about how he needed his knee braces and inhaler. ECF No. 1 at ¶ 40. That evening, Baltas wrote to the medical unit for replacement braces and an inhaler. *Id.* at ¶ 42. The following day, Baltas spoke with the Nurse Supervisor during her weekly tour to request his knee braces and an inhaler. *See id*. at ¶ 43. On June 24, 2018, Baltas began a hunger strike to protest the deprivation of his knee braces and inhaler. *See id*. at ¶ 53.

On June 25, 2018, the Nurse Supervisor spoke to Baltas about his hunger strike and subsequently provided him with his knee braces and inhaler, which later made Fitzgerald "irate." *Id.* at ¶¶ 54–55. On July 3, 2018, Brennan came to Baltas's cell and ordered Baltas to give her his knee braces. *Id.* ¶ 79. Brennan told Baltas that she had terminated his prescriptions and that he would go to administrative segregation if he did not provide her with his knee braces. *Id*. Baltas gave the knee braces to Brennan due to her threat. *Id*. at ¶ 80. Without knee braces and an inhaler, Baltas experienced "severe stress and anxiety." ECF No. 200 ¶ 153.

Baltas filed two Health Service Review ("HSR") grievances while at Corrigan. *See* ECF No. 120-2 ¶ 29. The first HSR grievance, filed on July 24, 2018, pertained to Baltas's "repeated efforts to obtain knee braces from medical over a 6[-]week period of time." *Id.* ¶¶ 30–31. Brennan, as the HSR Coordinator, reviewed this grievance. *Id.* ¶¶ 25, 31. In investigating Baltas's grievance, Brennan "was able only to locate one attempt made by [Baltas] on July 13, 2018[,] specific to obtaining knee braces." *Id.* ¶ 31. Brennan denied Baltas's grievance because "only one attempt was made to obtain the knee braces, and not several[,] as alleged." *Id.* ¶ 32. Baltas's second HSR

grievance, filed on August 1, 2018, pertained to an inhaler. *See id.* ¶ 30. This grievance was "returned without disposition" because "there was no evidence that a request was submitted to Medical specific to an inhaler as evidence of compliance with the grievance process." *Id.* ¶ 33.

Baltas's personal grievance log shows that he filed thirty-three grievances while at Corrigan. *See* ECF No. 199 at 23, 25; *id.* at 13 ¶ 4 (Baltas's declaration attesting that this grievance log includes all the grievances he filed at Corrigan). But the Corrigan administrative remedies records show that the prison processed only nine non-HSR grievances while Baltas was at Corrigan. *See* ECF No. 120-2 ¶ 20. Baltas filed three of the nine grievances on June 29, 2018. *Id.* The first grievance related to a "High Security Uniform." *Id.* The second grievance related to "Property." *Id.* And the third grievance related to "Knee Braces and Inhaler." *Id.* Baltas then filed five more of the nine grievances two days later, on July 1, 2018. *Id.* The first grievance related to "Chronic Discipline and Orientation Joint Recreation." *Id.* The second grievance related to "Unit Typewriter Policy." *Id.* The third grievance related to "Misappropriation of Funds – New TVs." *Id.* The fourth grievance related to "Recreate in High Security Uniforms Unsanitary." *Id.* And the fifth grievance related to "Due Process Failure/Disciplinary Ticket." *Id.* Faucher denied all nine of Baltas's processed grievances, except for one, which was "compromised." *Id.* ¶ 71. Under the Administrative Directives, a grievance is "compromised" if "[t]he application for administrative remedy has sufficient merit that some modification of the existing decision is warranted." ECF No. 121-2 at 9 (A.D. 9.6(3)(C)).

Faucher wrote Baltas a letter on July 10, 2018, stating that Baltas was "culpable of abusing" the grievance process by filing more than seven grievances in a sixty-day period. ECF No. 199 at 125. Faucher's letter admonished Baltas that if he "ignor[ed] the fact that [he] [was] abusing the

process, [he] w[ould] be placed on restriction." *Id.* On July 13, 2018, Fitzgerald attempted to order Baltas to withdraw his grievances, which Baltas refused to do. ECF No. 200 ¶ 110. Faucher sent another letter to Baltas on July 23, 2018, indicating that if Baltas "ignore[d] the fact that [Baltas] [was] abusing the process," Baltas's "restriction w[ould] be increased to one grievance per month and extended six months through May 11, 2019." ECF No. 199 at 129.

The defendants maintain that Baltas spent "approximately 34 days" in A-Pod. ECF No. 120-2 ¶ 106. But Baltas maintains that he was in A-Pod from June 15, 2018, to July 19, 2018, and from September 2, 2018, to September 11, 2018, for a total of forty-five days. *See* ECF No. 200 ¶ 106. Prison officials transferred Baltas from Corrigan on September 27, 2018. *See* ECF No. 120-2 ¶ 7.

## IV. LEGAL STANDARD

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113–14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (internal quotation marks and citation omitted). The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes

demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

Although I am required to read a self-represented party's "papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citation omitted),[3] "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## V. DISCUSSION

The defendants move for summary judgment on three grounds: (1) that Baltas failed to exhaust his administrative remedies under the PLRA; (2) that Baltas's claims fail on the merits; and (3) that the defendants are entitled to qualified immunity. ECF No. 120 at 1. Baltas argues that the defendants have waived their exhaustion or qualified immunity defenses by failing to "properly claim[ ] or preserve[ ] the [d]efenses," ECF No. 199-1 at 5, and that the defendants' "own conduct … estops them and precludes them from raising a non[-]exhaustion defense." *Id.* at 9. I begin by addressing Baltas's waiver argument.

### A. The defendants' ability to raise their affirmative defenses

[3] *See* note 1, *supra*.

Failure to exhaust administrative remedies and qualified immunity are both affirmative defenses. *See Jones v. Bock*, 549 U.S. 199, 216 (2007) (exhaustion); *Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (qualified immunity). Like any affirmative defense, these defenses may be waived. *See Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004) (failure to exhaust administrative remedies is an affirmative defense that can be waived); *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997) (qualified immunity is an affirmative defense that can be waived).

A defendant can waive an affirmative defense by "failing to assert the defense in [the defendants'] answer." *Walker v. Schult*, 45 F.4th 598, 615 (2d Cir. 2022) (citing Fed. R. Civ. P. 8(c). But even "when a defendant omits an affirmative defense from his answer, a district court may nevertheless decline to deem the defense waived if the plaintiff had notice and an opportunity to respond." *Jones v. Bryant Park Mkt. Events, LLC*, 658 F. App'x 621, 624 (2d Cir. 2016).

Baltas maintains that the defendants have waived their affirmative defenses by "fail[ing] to properly issue [n]otice of their [a]ffirmative [d]efenses within 45 days of [a]ppearance[,] as required by the Court's standing orders." ECF No. 199-1 at 5. The standing order to which Baltas refers states that "[i]f a defendant asserts any affirmative defenses related to (a) failure to exhaust administrative remedies; (b) jurisdiction; or (c) release of the claims at issue, counsel for that defendant shall file a notice with the Court within 45 days of the appearance of the defendant, describing the defenses." *Id.* at 618. The defendants appeared by counsel on March 10, 2022. ECF No. 34. Once counsel appeared, I extended the deadline for filing an answer to April 26, 2022. ECF No. 43. The defendants then filed a timely answer on April 25, 2022. ECF No. 45. The defendants raised four affirmative defenses in their answer, including failure to exhaust administrative remedies "with respect to all Defendants and all claims set forth in the Complaint,"

*id.* at 43, and qualified immunity. *Id.* at 42. By doing so, they preserved these defenses. *Cf. Walker*, 45 F.4th at 615. Accordingly, this objection is overruled.

Baltas also argues that the defendants "have 'acted in such a way as to estop them from raising the defense'" of failure to exhaust administrative remedies. ECF No. 199-1 at 9 (quoting *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006)). While courts formerly considered whether "the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense," *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), courts now consider, as I do below, whether a defendants' actions "thwart[ed] [an] inmate[ ] from taking advantage of a grievance process through machination, misrepresentation, or intimidation," *Ross v. Blake*, 578 U.S. 632, 644 (2016), to determine whether exhaustion of administrative remedies under the PLRA may be excused. *See Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) ("*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate."). Indeed, each Second Circuit case to cite *Hemphill* after *Williams* has noted that *Ross* either abrogated or overruled *Hemphill*. *See Riles v. Buchanan*, 656 F. App'x 577, 581 (2d Cir. 2016); *Medina v. Napoli*, 725 F. App'x 51, 54 n.1 (2d Cir. 2018); *Dickinson v. York*, 828 F. App'x 780, 783 n.3 (2d Cir. 2020); *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 312 (2d Cir. 2020); *Baltas v. Maiga*, 119 F.4th 255, 269 (2d Cir. 2024). Accordingly, this objection is overruled.

I analyze next whether Baltas's claims fail on the merits or whether the defendants are entitled to qualified immunity. I then analyze whether any surviving claim is exhausted or whether

exhaustion should be excused. I do so irrespective of "the precise arguments of counsel," by which I am "not hidebound…." *United States v. Sineneng-Smith*, 590 U.S. 371, 380 (2020).

### B. Merits and qualified immunity

The Second Circuit has recognized that "the merits of a constitutional claim generally are inextricably intertwined with qualified immunity because [a court] must determine whether a constitutional right has been violated before deciding whether the right was clearly established." *Demoret v. Zegarelli*, 451 F.3d 140, 152 (2d Cir. 2006). Accordingly, I address the defendant's merits and qualified immunity arguments consecutively as to each of Baltas's claims. *See*, *e.g.*, *Matzell v. Annucci*, 64 F.4th 425, 437 (2d Cir. 2023) ("[C]onsider[ing] both prongs of the qualified immunity analysis: first, whether [plaintiff] plausibly alleged a violation of his Fourteenth Amendment substantive due process right, and second, if so, whether that right was clearly established.").

#### i. Qualified immunity standard

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions[.]" *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

"When a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson,* 555 U.S. at 232). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks and citation omitted).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018). "It is not enough that the rule is suggested by then-existing precedent." *Wesby*, 583 U.S. at 63. Instead, the "decisions by [the Second Circuit] or other courts" must "clearly foreshadow a particular ruling on the issue," *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (internal quotation marks and citation omitted), such that the precedent is "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 583 U.S. at 63. "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Torcivia v. Suffolk Cnty., New York*, 17 F.4th 342, 367 (2d Cir. 2021*)* (internal quotation marks and citation omitted). But the Second Circuit has also acknowledged that this "is not the only way in which a right may be 'clearly established' for qualified immunity purposes." *Sloley v. VanBramer*, 945 F.3d 30, 40 (2d Cir. 2019). "In addition to being 'dictated by controlling authority,' a right may be 'clearly established' if it is supported by 'a robust consensus of cases of persuasive authority,'" *id.* (quoting *Wesby*, 583 U.S. at 63; citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

To be clearly established, a legal principle must also "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* This is to ensure that the "rule's contours" are "so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001)). As a result, the Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 63–64 (internal quotation marks and citation omitted); *see also, e.g.*, *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 43 (2019) (concluding that the "Court of Appeals should have asked whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances" instead of "defin[ing] the clearly established right at a high level of generality by saying only that the 'right to be free of excessive force' was clearly established."). The Supreme Court "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

A court is "entitled to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Johnson*, 859 F.3d at 170 (bracketed material substituted) (cleaned up). "Summary judgment on [qualified immunity grounds] is available if, with the facts taken in the light most favorable to the plaintiff, the alleged constitutional right either was not violated or was not clearly established at the time of the alleged violation." *Johnson*, 859 F.3d at 170.

In addition, "[e]ven if the right at issue was clearly established in certain respects…, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree'

on the legality of the action at issue in its particular factual context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017). Or "if the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officers is [also] appropriate." *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (bracketed material added).

Because a court may address either prong of the qualified immunity test first, *see Johnson*, 859 F.3d at 170, I initially examine "whether the facts presented 'make out a violation of a constitutional right.'" *Torcivia*, 17 F.4th at 367 (quoting *Pearson,* 555 U.S. at 232). If the facts before me do not "make out a violation of a constitutional right," *Pearson,* 555 U.S. at 232, summary judgment will enter in favor of the defendants on that claim. *See Palkimas v. Bella*, 510 F. App'x 64, 65 (2d Cir. 2013) (summary order) ("A public official is entitled to qualified immunity if *either* the plaintiff fails to 'make out a violation of a constitutional right' *or* fails to establish 'the right at issue was clearly established at the time of defendant's alleged misconduct.'" (emphasis added) (quoting *Pearson*, 555 U.S. at 232)).

If the facts before me *do* "make out a violation of a constitutional right," *Pearson,* 555 U.S. at 232, I then consider "whether the right at issue was clearly established when it was allegedly violated." *Pearson*, 555 U.S. at 232. If the right was not clearly established, summary judgment will enter in favor of the defendants. *See Palkimas*, 510 F. App'x at 65. If the right was clearly established, then I last consider if "officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Walczyk*, 496 F.3d at 154 (internal quotation

marks and citation omitted). Only if "no [official] of reasonable competence could have made the same choice in similar circumstances," *Lennon*, 66 F.3d at 420–21, will qualified immunity be unavailable to the defendants.

**ii. Eighth Amendment claims based on isolating conditions and lack of exercise against Fitzgerald and Faucher**

I construed Baltas's complaint as alleging an Eighth Amendment conditions of confinement claim related to restrictions imposed on him in A-Pod that rendered him isolated from others and unable to exercise. "[T]he Eighth Amendment proscribes the infliction of 'cruel and unusual punishments.'" *Edwards v. Quiros*, 986 F.3d 187, 192 (2d Cir. 2021) (citing U.S. Const. amend. VIII). "To prevail on an Eighth Amendment conditions-of-confinement claim against prison officials under 42 U.S.C. § 1983, a plaintiff must prove that 'objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities[.]'" *Id.* (quoting *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020); citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "[L]ife's necessities," *id.* (internal quotation marks and citation omitted), include "food, clothing, shelter, medical care, warmth, reasonable safety, sanitary living conditions, and exercise." *Carter v. Doe*, No. 3:20-CV-312 (SRU), 2020 WL 6136260, at *2 (D. Conn. Oct. 19, 2020). In evaluating a conditions of confinement claim, the court must consider the "duration and severity of the conditions[.]" *Darnell v. Pineiro*, 849 F.3d 17, 21 (2d Cir. 2017). But such a claim "d[oes] not require a 'minimum duration' or 'minimum severity' to reach the level of a constitutional violation." *Id.*

Even if an inmate has been "denied the minimal civilized measure of life's necessities," *Edwards*, 986 F.3d at 192 (internal quotation marks and citation omitted), an inmate seeking to

hold prison officials liable under the Eighth Amendment must also prove that in subjecting inmates to the particular condition, "the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (cleaned up). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety[.]'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer,* 511 U.S. at 837)). Those two requirements—a sufficiently serious condition and culpable state of mind—are often referred to as the "objective" and "subjective" elements of an Eighth Amendment claim. *See, e.g., Brock v. Wright*, 315 F.3d 158, 162–64 (2d Cir. 2003).

As to the objective element, courts in this district considering Eighth Amendment claims asserted by inmates subjected to similar restrictions as Baltas have concluded that such restrictions did not satisfy the objective element. For instance, in *Pagan v. Dougherty*, prison officials placed an inmate in segregation for two years because he was affiliated with a gang. *See* No. 3:18-CV-1668 (VLB), 2019 WL 2616975, at *3 (D. Conn. June 26, 2019). While in segregation, the inmate was "confined to his cell for 23 hours on weekdays and 24 hours on Saturdays and Sundays" and was "only permitted three showers per week and has lost his eligibility for parole, visits from friends and loved ones, the opportunity to call his loved ones everyday via telephone, the freedom to associate, and access to educational and vocational services." *Id.* at *4. The *Pagan* court dismissed the inmate's Eighth Amendment conditions of confinement claim because the inmate "ha[d] not alleged a sufficient deprivation to state a plausible inhumane conditions of confinement claim." *Id.* at *6.

I confronted a similar claim in *Doyle v. Santiago*, No. 3:19-CV-901 (MPS), 2019 WL 5298147, at *8 (D. Conn. Oct. 18, 2019). As in *Pagan*, prison officials also placed the *Doyle* inmate in segregation for two years because of his gang affiliation. *See id.* at *2. While in segregation, the inmate was similarly "confined to cell for 23 hours per day; [had] only one hour of outdoor recreation per weekday; [had] no, or limited, indoor recreation; [had] visits only from immediate family; [had] three showers per week; [had] limited telephone calls; [had] no access to books; [had] no programming; [had] insufficient medical and mental health staff assigned to unit; [had] no brush to clean toilet; and [had] more frequent cell searches." *Id.* at *8. I concluded that, "[a]lthough the conditions described may be harsh, they do not deprive the plaintiff of any basic human need and, therefore, are not unconstitutional." *Id.*

Courts have since cited *Pagan* and *Doyle* approvingly to conclude that inmates housed under similar conditions could not satisfy the objective element of an Eighth Amendment conditions of confinement claim. *See*, *e.g.*, *Kinnel v. Quieros*, No. 3:25-CV-518 (OAW), 2026 WL 1537774, at *3 (D. Conn. June 1, 2026) (relying on *Pagan* and *Doyle*, among other cases, to conclude that inmate who was confined in RHU for "22 hours of in cell time per day in a 'roughly' 60-square foot cell[,] without his personal property" and who had "little or no social interaction or mental stimulation," and was "unable work, attend religious services or educational and vocational programs, watch television, associate with other prisoners, participate in outdoor recreational activities or sports in a congregate setting, or take meals with other prisoners" failed to state Eighth Amendment claim); *Eckert v. Grady*, No. 3:19-CV-982 (VAB), 2020 WL 3129478, at *11 (D. Conn. June 12, 2020) (citing *Pagan* and *Doyle* to conclude the same on similar facts); *Orellano v. Papoosha*, No. 3:20-CV-00480 (VLB), 2021 WL 2109132, at *8 (D. Conn. May 25, 2021) (same).

Here, Baltas (by his account) was in A-Pod for forty-five days, ECF No. 200 ¶ 106—a much shorter time period than the two years that the *Pagan* and *Doyle* plaintiffs spent in segregation. *See Pagan*, 2019 WL 2616975, at *3; *Doyle* 2019 WL 5298147, at *2. While Baltas was in A-Pod, he was subject to similar restrictions as the inmates in *Pagan* and *Doyle. Compare* ECF No. 120-2 ¶¶ 9, 11, 13, 52, 54, 86, *with Pagan*, 2019 WL 2616975, at *4; *Doyle* 2019 WL 5298147, at *8. But despite these restrictions, Baltas enjoyed some freedoms that the inmates in *Pagan* and *Doyle* did not enjoy.

Unlike the inmate in *Doyle*, who had "no, or limited, indoor recreation," *Doyle* 2019 WL 5298147, at *8, Baltas was permitted "rec time," by his account, four days per week. *See* ECF No. 1 ¶ 46. And unlike the inmate in *Pagan*, who lost "the freedom to associate," *Pagan*, 2019 WL 2616975, at *4, Baltas was able to use his rec time to socialize with others. *See* ECF No. 200 ¶ 139 (stating that the "only opportunity [Baltas] had for any meaningful contact was his 1 [hour] of rec 4 days a week in A[-]Pod[.]"); *see also* ECF No. 120-2 ¶ 75. Although Baltas could not exercise during rec time, ECF No. 120-2 ¶ 67, he could exercise in his cell. *Id.* ¶ 86; *see also Shakur v. Sieminski*, No. 07-cv-1239 (CFD), 2009 WL 2151174, at *4–6 (D. Conn. July 15, 2009) (observing that, where an incarcerated person has the opportunity to exercise either in his cell or outside of his cell, prison officials had not violated the inmate's Eighth Amendment right to basic human needs).

Because the inmates in *Pagan* and *Doyle* faced more restrictive conditions for a much longer period of time, I cannot conclude, on this record, that "a reasonable jury" could find the objective element of this claim satisfied. *Nick's Garage*, 875 F.3d at 113–14 (internal quotation

marks and citation omitted). Accordingly, the defendants are entitled to summary judgment on this claim on the merits.

Because the facts in the record do not "make out a violation of a constitutional right," *Pearson*, 555 U.S. at 232, the defendants are also entitled to qualified immunity on this claim. *See Palkimas*, 510 F. App'x at 65. But even if the facts in the record did "make out a violation of a constitutional right," *Pearson*, 555 U.S. at 232, the defendants would still be entitled to qualified immunity because "the right at issue" was not "clearly established at the time of defendant's alleged misconduct." *Id*. at 232; *see also*, *e.g.*, *Baltas v. Chapdelaine*, 153 F.4th 328, 336 (2d Cir. 2025) (holding that "[i]t [wa]s not clearly established that the level of social isolation in Q-Pod," which included "up to 22 hours per day of social isolation," violated the Eighth Amendment, and "so we affirm the district court's grant of qualified immunity as to these claims.").

Lastly, officials of "reasonable competence could have made the same choice in similar circumstances," *Lennon*, 66 F.3d 416 at 420–21, given the danger that Baltas presented to other inmates and prison staff, as reflected in his concurrent Chronic Discipline and High Security classifications. *See* ECF No. 120-2 ¶ 13 (noting that, "[u]pon his arrival at Corrigan, [Baltas] was classified High Security, concurrent to Chronic Discipline."); *id.* ¶ 51 (Chronic Discipline inmates "posed a threat to the security and orderly operation of a facility, or a risk to the safety or staff or other inmates due to repetitive disciplinary infractions."); *id.* ¶ 54 (High Security inmates "posed a threat to the safety and security of the facility, staff, inmates, or the public."). Accordingly, summary judgment must enter in favor of Fitzgerald and Faucher on both the merits of these claims and on qualified immunity grounds.

**iii. Eighth Amendment harassment claims against Fitzgerald based on his orders to impose increased searches and restrictions on Baltas**

I construed Baltas's complaint as alleging an Eighth Amendment harassment claim based on Baltas's allegations that Fitzgerald ordered a cell search that destroyed Baltas's living quarters, ordered daily searches of Baltas's cell, and ordered a search every time Baltas exited his cell. *See* ECF No. 27 at 34. Because the destructive cell search is the most serious of these allegations, I begin by considering whether a reasonable jury could find in favor of Baltas on his Eighth Amendment claim related to the destructive cell search.

"[T]he Eighth Amendment protects prisoners from 'calculated harassment unrelated to prison needs[.]'" *Telesford v. Annucci*, 693 F. App'x 1, 3 (2d Cir. 2017) (summary order) (quoting *Hudson v. Palmer*, 468 U.S. 517, 530 (1984)). "Prison cell searches are actionable under the Eighth Amendment only if they lack any legitimate penological interest *and* are intended solely to harass the inmate." *Doyle*, 2019 WL 5298147, at *8 (emphasis added).

To state an Eighth Amendment claim based on a harassing cell search, "[t]he inmate must allege that a defendant ordered the search with the specific intent to cause plaintiff harm *and* that the search in fact caused him harm." *Green v. Tavernier*, No. 3:18-CV-1781 (CSH), 2019 WL 2015849, at *6 (D. Conn. May 7, 2019) (cleaned up) (emphasis added). "Thus, the deprivation incurred must be sufficiently serious to satisfy the objective component of the deliberate indifference test, i.e., the search must have denied the plaintiff the minimal civilized measure of life's necessities." *Id.* (internal quotation marks and citation omitted). As with any other Eighth Amendment claim, Baltas must also establish the subjective component with facts establishing that Fitzgerald acted with deliberate indifference towards Baltas. *See Crispin v. Dougherty*, No.

3:25-CV-00428 (SVN), 2025 WL 2223893, at *9 (D. Conn. Aug. 5, 2025) (noting that "all Eighth Amendment claims … ha[ve] both an objective and subjective component."); *Walker*, 717 F.3d at 125; *Chance*, 143 F.3d at 702.

As to the objective component, a reasonable jury could find that Fitzgerald's ordering staff to "'tear through Baltas'[s] cell,'" ECF No. 1 ¶ 57(b), supports an inference that Fitzgerald "ordered the search with the specific intent to cause plaintiff harm…." *Green*, 2019 WL 2015849, at *6 (cleaned up). But for Fitzgerald's order to rise to an Eighth Amendment violation, the search must have also "caused [Baltas] harm." *Id.* (cleaned up).

Baltas maintains that the officers "'t[ore] through' and destroy[ed] his living quarters," ECF No. 1 ¶ 58, but this allegation is conclusory. *See*, *e.g., Stepak v. Aetna Life & Cas. Co.*, No. CIV.H:90CV00886 (AVC), 1994 WL 858045, at *21 (D. Conn. Aug. 29, 1994) (allegation that person "destroyed relevant files" was conclusory), *aff'd*, 52 F.3d 311 (2d Cir. 1995). And "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), or "[s]tatements that are devoid of any specifics," *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999), to defeat summary judgment. Even if, by "destroy[ed]," ECF No. 1 ¶ 58, Baltas meant that the officers left the cell in disarray, *see id.* ¶ 52 (stating that the cell searches "left his cell in disarray"), this would still be insufficient to constitute the harm necessary to satisfy the objective element. *See*, *e.g.*, *Green*, 2019 WL 2015849, at *6 (concluding that plaintiff did not establish harm by alleging "only that his belongings were scattered about the cell and his mattress was in the corridor" after the cell search).

Moreover, to satisfy the objective element, the cell search must "lack *any* legitimate penological interest," even if Fitzgerald ordered the search "to harass the inmate." *Doyle*, 2019

WL 5298147, at *8 (emphasis added) ("Prison cell searches are actionable under the Eighth Amendment only if they lack any legitimate penological interest *and* are intended solely to harass the inmate." (emphasis added)).

"Preventing the flow of contraband in prison is certainly a legitimate penological interest[.]" *Barnes v. Fedele*, 813 F. App'x 696, 700 (2d Cir. 2020) (summary order) (citing *Bell v. Wolfish*, 441 U.S. 520, 559–60 (1979); *Sec. & Law Enf't Emps., Dist. Council 82, Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO by Clay v. Carey*, 737 F.2d 187, 204 (2d Cir. 1984)). Thus, the Supreme Court and the Second Circuit have long recognized that "security concerns can justify … wholly random cell searches[.]" *United States v. Amen*, 831 F.2d 373, 379–80 (2d Cir. 1987) (citing *Block v. Rutherford,* 468 U.S. 576, 589–91 (1984); *Hudson,* 468 U.S. at 530). If "security concerns can justify … wholly random cell searches," *id.*, they can also justify frequent, even daily, cell searches, including whenever Baltas left his cell. *See* ECF No. 120-2 ¶ 54 (relevant Administrative Directive for High Security inmates like Baltas required cell searches at "a *minimum* of 2 time per week"). Because these frequent cell searches served a legitimate penological interest, no reasonable jury could find the objective element satisfied on this record with regard either to the daily searches or to Fitzgerald's order resulting in a "destructive" search of Baltas's cell, even if all this was meant to harass Baltas. *See Doyle*, 2019 WL 5298147, at *8. Accordingly, the defendants are entitled to summary judgment on this claim on the merits.

Because the facts in the record do not "make out a violation of a constitutional right," *Pearson*, 555 U.S. at 232, Fitzgerald is also entitled to qualified immunity on this claim. *See Palkimas*, 510 F. App'x at 65. But even if the facts in the record did "make out a violation of a constitutional right," *Pearson*, 555 U.S. at 232, Fitzgerald would still be entitled to qualified

immunity because "the right at issue" was not "clearly established at the time of defendant's alleged misconduct." *Id*. Although the Supreme Court and the Second Circuit have recognized an inmate's right to generally be free "from calculated harassment unrelated to prison needs," *Telesford*, 693 F. App'x at 3 (internal quotation marks omitted) (quoting *Hudson*, 468 U.S. at 530), the cell search in this case, to the extent it can be considered "harassment," *id.*, was not "unrelated to prison needs," for the reasons described above. *Id.*

At any rate, Baltas has not pointed to any Supreme Court or Second Circuit case holding that an inmate retains a right to be free from harassing cell searches. *See Torcivia*, 17 F.4th at 367. While some district courts have recognized cell searches as "actionable under the Eighth Amendment" if the searches "lack any legitimate penological interest and are intended solely to harass the inmate," *Doyle*, 2019 WL 5298147, at *8, their decisions, taken together, do not "clearly foreshadow a particular ruling on the issue," *Scott*, 616 F.3d at 105 (internal quotation mark and citation omitted), in light of Supreme Court case law holding that harassing cell searches are not unconstitutional under the Fourth Amendment. *See Hudson*, 468 U.S. at 520, 526 (where inmate claimed that corrections officer had conducted "shakedown search of his cell and had brought a false charge against him solely to harass him," holding that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell" because "[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions."); *Willis v. Artuz*, 301 F.3d 65, 68 (2d Cir. 2002) (noting that the *Hudson* court reached its holding "notwithstanding the allegation … that the search at issue served no institutional security-related purpose but was conducted solely for harassment." (citing *Hudson*, 468 U.S. at 526)).

The Supreme Court's holding in *Hudson* that harassing cell searches are constitutional under the Fourth Amendment thus does not "clearly foreshadow a particular ruling," *Scott*, 616 F.3d at 105 (internal quotation mark and citation omitted), that such searches are unconstitutional under the Eighth Amendment—at least to the extent "that every reasonable official would interpret [these district court decisions] to establish the particular rule the plaintiff seeks to apply." *Wesby*, 583 U.S. at 63 (bracketed material added). Accordingly, Fitzgerald is entitled to qualified immunity on this claim.

**iv. Eighth Amendment failure to protect claims against Faucher**

I construed Baltas's complaint as alleging an Eighth Amendment failure to protect claim based on Baltas's allegations that Faucher did nothing to protect Baltas from conduct by Fitzgerald and other correctional staff that subjected Baltas to ongoing harassment and retaliatory conduct. *See* ECF No. 27 at 34.

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of [ ] inmates…." *Hudson*, 468 U.S. at 526–27. A prison official violates the prisoner's Eighth Amendment protection against cruel and unusual punishment only when the prisoner satisfies two elements, one objective and one subjective. *See Rivera v. Hackett*, No. 3:18-CV-969 (MPS), 2018 WL 3489587, at *2 (D. Conn. July 18, 2018).

The objective component requires a prisoner to "show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. "A plaintiff may show a substantial risk of harm from a specific assailant, or a more general risk of harm due to the conditions at the time of the attack." *Johnson v. Doe*, No. 3:25-CV-00030 (VAB), 2025 WL 950816, at *3 (D. Conn. Mar. 28, 2025) (cleaned up).

The subjective component requires a prisoner to show that the prison official acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297). To meet this standard, "the official must know of and disregard an excessive risk to inmate health or safety[.]" *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020) (cleaned up).

Even if a reasonable jury could infer from the record that correctional officers "pos[ed] a substantial risk of serious harm," *id.*, to Baltas, in satisfaction of the objective element, no reasonable juror could find from this record that Baltas has satisfied the subjective component.

In the related context of inmate-on-inmate assaults, courts have found the subjective component to be satisfied if "the prisoner alleges that he informed correctional officials about a specific fear of assault prior to being assaulted[,]" as long as the "information provided to correctional officials" is "sufficiently detailed so as to establish that the correctional officials were sufficiently aware of the risk of harm at issue." *Pagan v. Colon*, No. 3:22-cv-00001 (KAD), 2022 WL 475176, at *4 (D. Conn. Feb. 16, 2022). A prison official who ignores a prisoner's "specific, repeated, and urgent expressions of fear for his safety" is "subjective[ly] aware[ ] of, and deliberately indifferent to" a substantial risk of serious harm. *Morgan v. Dzurenda*, 956 F.3d 84, 90 (2d Cir. 2020).

Here, Baltas alleges that on July 6, 2018, he "spoke with Warden Faucher about all the issues previously described, inclusive of, but not limited to[,] the incidents involving Fitzgerald and [correctional officer] Bauer, his medical issues, and his religious access," but "Faucher stated he would do nothing." ECF No. 1 ¶ 86. Without more, though, such a statement is not "sufficiently detailed so as to establish that the correctional officials were sufficiently aware of the risk of harm at issue," *Pagan*, 2022 WL 475176, at *4; *see also LaRose v. Am. Med. Response of Connecticut,*

*Inc.*, No. 24-962, 2025 WL 1524053, at *1 (2d Cir. May 29, 2025) (summary order) (noting that "vague assertions are insufficient to create a genuine dispute of material fact.").

One conversation with Faucher, involving multiple topics of concern to Baltas, *see* ECF No. 1 ¶ 86, does not come close to a "specific, repeated, and urgent expression of fear for [Baltas's] safety." *Morgan*, 956 F.3d at 90. Baltas maintains that he "wrote multiple requests to Faucher regarding all the aforementioned issues[,]" ECF No. 1 ¶ 85, but there is no evidence in the record of what those requests contained, when they were sent, or whether Faucher received and reviewed them. Accordingly, no reasonable jury could conclude from the record evidence that Baltas could satisfy the subjective element of this claim. *See*, *e.g.*, *Gordon v. City of New York*, No. 05-0351-PR, 2005 WL 2899863, at *1 (2d Cir. Nov. 3, 2005) (summary order) (affirming summary judgment on failure to protect claim because inmate "failed to adduce sufficient evidence for a reasonable fact-finder to conclude that [defendants] acted more than negligently in failing to protect [inmate] from the attack."). Because the facts in the record do not "make out a violation of a constitutional right," *Pearson,* 555 U.S. at 232 Faucher is also entitled to qualified immunity on this claim. *See Palkimas*, 510 F. App'x at 65.

#### v. Eighth Amendment medical indifference claims against Fitzgerald, Faucher, and Brennan

I construed Baltas's complaint as alleging an Eighth Amendment medical indifference claim based on Baltas's allegations that Fitzgerald, Faucher, and Brennan were deliberately indifferent to Baltas's knee conditions and asthma by allegedly denying him knee braces and an inhaler. *See* ECF No. 27 at 35–36.

The Eighth Amendment forbids deliberate indifference to prisoners' serious medical needs. *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). To state a claim for deliberate indifference to serious medical needs, the prisoner must allege facts satisfying two elements, one objective and one subjective. *See id.*

The objective element requires the prisoner to demonstrate that the alleged deprivation of medical care was "sufficiently serious." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). This objective showing in turn requires a court to make two inquiries. *See Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), *abrogated on other grounds as recognized by Kravitz v. Purcell*, 87 F.4th 111, 119, 122 (2d Cir. 2023).

First, the Court must determine whether the inmate was "actually deprived of adequate medical care" by an official's failure "to take reasonable measures" in response to a sufficiently serious medical condition. *Id.* at 279–80; *see also Davila v. UConn Med. Ctr.*, 353 F. App'x 490, 492 (2d Cir. 2009) (summary order) ("At the most basic level, to establish a claim under the Eighth Amendment for deliberate indifference, the plaintiff must first demonstrate that he was 'actually deprived of adequate medical care.'" (quoting *Salahuddin*, 467 F.3d at 279)).

Second, the Court must determine "whether the inadequacy in medical care is sufficiently serious," requiring an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. This examination differs based on whether the issue is failure to provide *any* medical treatment, inadequate treatment, or delayed treatment. *See Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003).

If an inmate was completely deprived of medical care, "courts examine whether [the

inmate's] medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280. "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Id.* (cleaned up) (quoting *Chance,* 143 F.3d at 702).

If an inmate received medical treatment but it was inadequate, "the seriousness inquiry is narrower," and "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Id*. (internal quotation marks and citation omitted). "On the one hand, a defendant's delay in treating an ordinarily insignificant medical condition can become a constitutional violation if the condition worsens and creates a substantial risk of injury." *Thomas v. Jacobs*, No. 19-CV-6554 (CS), 2025 WL 662899, at *14 (S.D.N.Y. Feb. 28, 2025) (cleaned up). "But on the other, delay in treating a life-threatening condition may not violate the Eighth Amendment if the lapse does not cause any further harm beyond that which would occur even with complete medical attention." *Id.* (internal quotation marks and citation omitted).

As to the subjective element, "[a]n official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety,'" *Smith*, 316 F.3d at 184 (quoting *Chance,* 143 F.3d at 702), which is "a state of mind 'equivalent to the familiar standard of recklessness' as used in criminal law." *Id.* (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir. 2002) (*per curiam*)). Conduct may rise to the level of deliberate indifference when the prison official's act or failure to act "evinces 'a conscious disregard of a substantial risk

of serious harm.'" *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (quoting *Farmer*, 511 U.S. at 839).

With regard to the knee braces, a reasonable jury could infer that at least one defendant "actually deprived [Baltas] of adequate medical care" by withholding knee braces from him. *Salahuddin*, 467 F.3d at 279. The knee braces could be considered "treatment" for Baltas's knee condition because he chose those knee braces "in lieu of" surgery. *See* ECF No. 200 ¶ 151. Baltas was deprived of this treatment from June 6, 2018, the date he arrived at Corrigan, ECF No. 120-2 ¶ 7, to June 25, 2018, when the Nurse Supervisor gave Baltas the knee braces. ECF No. 1 ¶ 54. Brennan then later deprived Baltas of the knee braces again after she took them from Baltas after July 3, 2018. *See id.* ¶¶ 79–80. Thus, I understand Baltas to allege the defendants failed to provide any medical treatment. Accordingly, I consider whether Baltas's medical condition is "sufficiently serious." *Salahuddin*, 467 F.3d at 280.[4]

The Second Circuit has not considered whether a knee injury is "sufficiently serious." *Salahuddin*, 467 F.3d at 280. But some district courts have assumed, on initial review, that "knee injuries requiring surgery are 'sufficiently serious.'" *Crenshaw v. Furtick*, No. 3:25-CV-1726 (SFR), 2026 WL 1123556, at *7 (D. Conn. Apr. 24, 2026) (quoting *Salahuddin*, 467 F.3d at 280). Other district courts in this Circuit, however, have "consistently f[ou]nd that pain associated with injuries such as a ligament tear are not sufficiently serious under the Eighth Amendment."

---

[4] The defendants "concede, but do not agree" that Baltas's "need for a knee brace and inhaler is a serious medical need." ECF No. 120-1 at 25. To the extent this is a concession, I need not accept it. See *Realty LLC v. City of New York*, 118 F.4th 505, 524 n.12 (2d Cir. 2024) (noting that "this court is not bound by litigants' concessions on points of law." (citing, *inter alia*, *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 99 (1991) (holding parties' legal theories are not binding on the court, which "retains the independent power to identify and apply the proper construction of governing law"))).

*Kimbrough v. Malloy*, No. 3:24-CV-1572 (KAD), 2025 WL 1707816, at *4 (D. Conn. June 18, 2025) (citing, *inter alia*, *Williamson v. Goord*, No. 02-CV-521, 2006 WL 1977438, at *19 n.120 (N.D.N.Y. July 11, 2006) (collecting cases where knee injuries such as a torn meniscus and ligament tears were found not to be sufficiently serious)).

No reasonable jury could conclude, on this record, that Baltas's "torn cartilage" and cyst in his knee, ECF No. 200 ¶ 151, are "sufficiently serious," *Salahuddin*, 467 F.3d at 280, especially in light of Baltas opting for knee braces "in lieu of" surgery. *See* ECF No. 200 ¶ 151; *cf. Crenshaw*, 2026 WL 1123556, at *7. Moreover, it is difficult to understand how Baltas's knee injury could be "sufficiently serious" under the standard set forth in *Salahuddin* when Baltas had been complaining to prison officials about his inability to exercise. *See* ECF No. 1 ¶¶ 35, 37. Although some courts have concluded that a plaintiff's knee pain that was "so severe that he could barely walk" or "could not walk at all" satisfied the objective element, *Poole v. Armor Corr. Health Servs.*, No. 15CV2927JFBAKT, 2016 WL 1089350, at *5 (E.D.N.Y. Mar. 21, 2016), Baltas makes no allegation that he could not walk and alleged elsewhere in his complaint that he could walk and wanted to exercise. *See* ECF No. 1 at ¶ 64 (Baltas alleging that he "walked away" after corrections officers threatened him); ¶¶ 146, 149, 153, 158 (Baltas alleging that he was escorted to vehicle for transport to court, that upon arrival at court, he "exited the cab of the truck," and that he "proceeded to the lock up area," all without any mention of knee pain); ¶ 37 (Baltas voicing complaints about restrictions on his ability to exercise).

As for the inhaler, a reasonable jury could infer that at least one defendant "actually deprived [Baltas] of adequate medical care" by withholding his inhaler from him. *Salahuddin*, 467 F.3d at 279. Because Baltas eventually received the inhaler, *see* ECF No. 120-2 ¶ 42; ECF

No. 1 ¶ 54, I construe the complaint as alleging that the defendants delayed treatment. *See Burns v. Lupis*, No. 3:23-CV-23 (KAD), 2023 WL 1801704, at *4, n.4 (D. Conn. Feb. 7, 2023) (construing plaintiff's claim regarding his knee as a delay in treatment, rather than a denial of treatment, because he eventually received medication for his knee and a bottom bunk pass).

Whether a delay in treatment satisfies the objective element depends first on whether the condition was "ordinarily insignificant" or "life-threatening." *Thomas,* 2025 WL 662899, at *14. "Courts within the Second Circuit have held that the fact that an inmate is asthmatic does not, by definition, constitute a serious medical need." *Paschal-Barros v. Balatka*, No. 3:18-CV-2021 (VLB), 2020 WL 5230994, at *5 (D. Conn. Sept. 1, 2020), *aff'd*, No. 20-3150-CV, 2021 WL 5268000 (2d Cir. Nov. 12, 2021). Thus, I consider Baltas's asthma to be "ordinarily insignificant." *Thomas,* 2025 WL 662899, at *14. As such, there must be some evidence in the record that Baltas's asthma worsened without an inhaler. *See id.* But Baltas points to no specific evidence that he had an asthma attack or difficulty breathing without his inhaler. Nor does he point to any other evidence that his asthma condition worsened, and I can find none. I conclude that a reasonable jury could not find the objective element satisfied.

Even if a reasonable jury could find the objective element satisfied as to either Baltas's knee or asthma condition, the record does not show that any defendant's actions "evince[d] 'a conscious disregard of a substantial risk of serious harm,'" *Hathaway*, 99 F.3d at 553 (2d Cir. 1996) (quoting *Farmer*, 511 U.S. at 839), in satisfaction of the subjective element. No reasonable jury could conclude that withholding knee braces and an inhaler from someone healthy and fit enough to exercise in the absence of such devices would place him at a "substantial risk of serious harm." *Farmer*, 511 U.S. at 839. Withholding the inhaler from Baltas would presumably pose

more of a "substantial risk of serious harm," *id.*, to Baltas than withholding the knee braces because it would potentially affect his ability to breathe, as opposed to ambulate. But no reasonable jury could conclude that withholding a medical device that assisted with breathing could pose a "substantial risk of serious harm," *Farmer*, 511 U.S. at 839, to someone who chose to breathe in burning plant material daily. *See* ECF No. 200 ¶ 142 (Baltas was able to smudge while in the RHU from June 6, 2018, to September 6, 2018, and from September 11, 2018, to September 27, 2018); ECF No. 120-2 ¶ 62 (smudging "involved the act of burning sacred herbs for cleansing and purification.").

For these reasons, I conclude that a reasonable jury could not find either the objective or subjective elements satisfied on this claim. *See*, *e.g.*, *Paschal-Barros*, 2021 WL 5268000, at *1 (affirming summary judgment on Eighth Amendment deliberate indifference claim because inmate "failed to raise a question of material fact that defendants were aware of and disregarded a serious risk that he would be harmed by the chemical agent" where his "asthma was well-controlled; his medical records listed no contraindications concerning the use of chemical agents; and he did not have an asthma attack when the chemical agent was used or afterwards."). And because the claim fails on the merits, the defendants are entitled to qualified immunity. *See Palkimas*, 510 F. App'x at 65.

**vi. Fourteenth Amendment equal protection claims against Fitzgerald**

I permitted Baltas to proceed on an Equal Protection claim against Fitzgerald based on Baltas's allegations that Fitzgerald treated him differently than all other inmates by restricting his access to a typewriter; treated him differently from all other Chronic Discipline inmates by

prohibiting his access to smudging; and instructed staff to target Baltas for investigations and impose specific increased restrictions and searches on him. *See* ECF No. 27 at 44.

Under the Equal Protection Clause of the Fourteenth Amendment, "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. Because Baltas does not allege that he was a member of a protected class, I consider the two "distinct pathways for proving a non-class-based Equal Protection violation." *Hu v. City of New York*, 927 F.3d 81, 93 (2d Cir. 2019).

The first pathway, "[a] selective enforcement claim[,] requires a demonstration that a person was treated differently than others similarly situated based on impermissible considerations, such as race or religion." *Caldwell v. Geronimo*, No. 22-1866, 2023 WL 6381292, at *2 (2d Cir. Oct. 2, 2023) (summary order) (citing *Hu*, 927 F.3d at 91). To prevail on a selective enforcement claim, a plaintiff must show that "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Hu*, 927 F.3d at 91 (internal quotation marks omitted) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)).

The second pathway, "a class of one" claim, also contains two elements. To prevail on a class of one claim, a plaintiff must prove that he is "*prima facie* identical" to a comparator by showing that: "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment

are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Hu*, 927 F.3d at 92 (internal quotation marks and citation omitted).

Both pathways "require a showing that the plaintiff was treated differently from another similarly situated comparator, though the degree of similarity required for each type of claim differs significantly—whereas a class of one theory requires that a plaintiff establish an extremely high degree of similarity between a plaintiff and comparator, a selective enforcement theory merely requires a reasonably close resemblance between a plaintiff's and comparator's circumstances." *Mozzochi v. Town of Glastonbury*, No. 3:21-CV-01159 (MPS), 2023 WL 3303947, at *3 (D. Conn. May 8, 2023) (cleaned up) (quoting *Hu*, 927 F.3d at 93). If a plaintiff does not identify a proper comparator, summary judgment will enter on an equal protection claim, regardless of the pathway. *See*, *e.g.*, *Searle v. Red Creek Cent. Sch. Dist.*, No. 22-2049-CV, 2023 WL 3398137, at *3 (2d Cir. May 12, 2023) (summary order) (affirming summary judgment on equal protection claim because plaintiff "failed to identify comparators whose circumstances are similar enough to satisfy the standard for either a selective enforcement or a class-of-one claim.").

Baltas's complaint mentions another inmate named Bahm Oh, who was "also on CD and high security." ECF No. 1 ¶ 56. Baltas presumably mentions Oh and his custody status for the purpose of establishing Oh as a comparator. Baltas does not elaborate on his conclusory assertion that Oh was "high security," however, and the defendants maintain that Oh "was only classified Chronic Discipline II and was not on dual classification status like [Baltas]." ECF No. 120-2 ¶ 104. Baltas denies this, but his assertion in his Local Rule statement that "Bahm was also CD II…" does not rebut Defendants' assertion of the same point. ECF No. 200 ¶ 104. Nor does Baltas's Rule 56(a)2 statement rebut that Oh "was not on dual classification status like [Baltas]." ECF No.

120-2 ¶ 104; *see also* ECF No. 200 ¶ 104. In fact, Oh's affidavit attached to Baltas's complaint states that "at all times mentioned [Oh] was incarcerated in the Corrigan C.I. in A-Pod on Chronic Discipline Status Interval II." ECF No. 1-1 at 4 ¶ 2. The affidavit does not mention that Oh was also on High Security status. *See id.* at 4–5. Thus, there is no evidence that Oh shared Baltas's dual-classification, despite Baltas's initial claim that he did so.

As an inmate classified as "High Security, concurrent to Chronic Discipline," ECF No. 120-2 ¶ 13, Baltas would have been subject to the restrictions placed on both High Security and Chronic Discipline inmates. *See id.* ¶ 54 (indicating that High Security "can be used in conjunction with placement on any other restrictive status."). High Security inmates are subject to restrictions that are in some respects more onerous than those imposed on Chronic Discipline inmates. *Compare id.* ¶ 52 (Chronic Discipline restrictions), *with id.* ¶ 54 (High Security restrictions). Because Baltas, unlike Oh, was subject to the additional restrictions placed on High Security inmates, Oh is not a proper comparator. *See Petitpas v. Martin*, No. 20-3557-PR, 2021 WL 6101469, at *2 (2d Cir. Dec. 22, 2021) (summary order) (concluding that plaintiff's "proffered comparators—whether described generally as 'other inmates' or individually as specific inmates who have received risk level reductions"—were not proper comparators because they were not, like plaintiff, "sex offenders, which is a basic difference motivating their disparate treatment."). Rather, proper comparators are inmates like Baltas who were classified as "High Security, concurrent to Chronic Discipline." ECF No. 120-2 ¶ 13. The record contains no evidence of such inmates.

Even if Oh was classified as "High Security, concurrent to Chronic Discipline," ECF No. 120-2 ¶ 13, the record contains no evidence that Baltas was treated differently than Oh or other

inmates who were classified as "High Security, concurrent to Chronic Discipline." *Id.*; *see also Ruggiero v. Fischer*, 807 F. App'x 70, 74 (2d Cir. 2020) (summary order) (holding that district court properly granted summary judgment on equal protection claim because inmate "made no showing at all that he was treated differently from SHU inmates at other institutions."). Accordingly, summary judgment must enter on this claim because, regardless of the pathway under which Baltas brings it, the record contains no evidence of a proper comparator or evidence that Baltas was treated differently than a proper comparator. *See Searle* 2023 WL 3398137, at *3. And because this claim fails on the merits, Fitzgerald is entitled to qualified immunity. *See Palkimas*, 510 F. App'x at 65.

**vii. First Amendment retaliation claims against Fitzgerald, Faucher, and Brennan**

I permitted Baltas to proceed on a First Amendment retaliation claim against Fitzgerald based on Baltas's allegations that Fitzgerald prevented Baltas from receiving his inhaler and knee braces and personal property (including his electronics) and instructed staff to impose heightened restrictions and increased searches on him after learning that Baltas had complained to Faucher about restrictions and lack of exercise while in A-Pod. *See* ECF No. 27 at 46. I also permitted Baltas to bring this claim against Fitzgerald based on Baltas's allegations that Fitzgerald ordered a destructive cell search; had Baltas falsely charged in disciplinary reports; changed the typewriter policy to restrict Baltas's typewriter use; prevented Baltas from exercising his religious rights; instructed Brennan to take away Baltas's knee braces; and imposed a restrictive uniform and search policy for Chronic Discipline inmates after Baltas informed Fitzgerald about his plan to file a lawsuit about his confinement at Corrigan. *Id.* at 47.

I also permitted Baltas to bring this claim against Faucher and Fitzgerald based on Baltas's allegations that these defendants placed Baltas in the RHU and issued him a false disciplinary report for falsely reporting an incident after Baltas filed a PREA complaint. *Id.* And I permitted Baltas to bring this claim against Faucher based on Baltas's allegations that Faucher placed Baltas on a grievance restriction after Baltas filed a grievance about fraud and misappropriation of funds. *Id.* I also permitted Baltas to bring this claim against Brennan based on Baltas's allegations that Brennan allegedly threatened Baltas with disciplinary action and denied his grievances for providing false information about having filed multiple requests. *Id.* at 47–48.

The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)). Thus, retaliation claims "stated in wholly conclusory terms" are insufficient. *Id.* (internal quotation marks and citations omitted).

To prove a First Amendment retaliation claim, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Id.* at 294 (internal quotation marks and citation omitted). "[T]he filing of a lawsuit or a grievance is protected conduct." *Walker v. Senecal*, 130 F.4th 291, 298 (2d Cir. 2025). "An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness

from exercising his or her constitutional rights.'" *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Davis*, 320 F.3d at 353).

"To sufficiently allege a causal connection, [Baltas's] allegations must support an inference that the protected conduct was 'a substantial or motivating factor for the adverse actions taken by prison officials.'" *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (summary order) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003)). An inmate may "establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). But "[i]n the context of prisoner retaliation claims, [the Second Circuit] ha[s] required evidence beyond temporal proximity between the protected activity and the adverse action before allowing a prisoner to proceed to trial on such a claim." *Davis v. Florence*, 600 F. App'x 26, 27 (2d Cir. 2015) (summary order) (citing *Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir. 1995)). Thus, a court may also consider other factors like "the prisoner's prior good disciplinary record," "a finding of not guilty at the disciplinary hearing," and "statements by the officials showing motivation." *Ramos v. Semple*, No. 3:18-CV-1459 (VAB), 2019 WL 2422875, at *2 (D. Conn. June 10, 2019).

Here, the parties do not dispute that Baltas told Fitzgerald that he was using the typewriter to type up a lawsuit about "'all the shit wrong with this place,'" ECF No. 1 ¶ 57(a), in satisfaction of the first element. *See Conquistador v. Martin*, No. 3:19-CV-1965 (KAD), 2020 WL 136872, at *4 (D. Conn. Jan. 13, 2020) (assuming that "threats to file lawsuits are protected speech."). The parties do not dispute that Fitzgerald told staff to "start the shakedowns" and "'tear through Baltas'[s] cell'" after Baltas told Fitzgerald that Baltas was using the typewriter to type up the

lawsuit. ECF No. 1 ¶ 57(b). Nor do the parties dispute that Fitzgerald issued Baltas a false disciplinary report for refusing to lock up when recreation time was over. *Id*. at ¶ 71.

Although cell searches by themselves may not constitute an adverse action, *see Dorsey*, 468 F. App'x at 27 (concluding that "allegations that [officer] ordered or otherwise conducted two searches of [inmate's] cell and two searches of his person over a six-month period are insufficient to show adverse action."), a cell search combined with other retaliatory conduct may constitute an adverse action. *See*, *e.g.*, *Kotler v. Boley*, No. 21-1630, 2022 WL 4589678, at *2 (2d Cir. Sept. 30, 2022) (summary order) (a "cell search, the issuance of a disciplinary report based on an item that would usually just be thrown away, a false disciplinary report, placement in disciplinary housing, and false testimony at a disciplinary hearing" satisfied adverse action element). Thus, the cell search, combined with Fitzgerald issuing Baltas a false disciplinary report, *see* ECF No. 1 ¶ 71, satisfies the second element. *See Kotler*, 2022 WL 4589678, at *2.

As to the third element, the cell search occurred immediately after Baltas threatened to file a lawsuit and after Fitzgerald told Baltas that he would make Baltas's "'life hell.'" *See* ECF No. 1 ¶¶ 57(a), 58. Fitzgerald issued the false disciplinary report on the same date. *See id.* ¶ 71. Fitzgerald's statements to Baltas, combined with the temporal proximity of the protected speech and adverse actions, are sufficient to satisfy the third element. *See Kotler*, 2022 WL 4589678, at *2. Accordingly, the record contains a genuine dispute of material fact on Baltas's First Amendment retaliation claim against Fitzgerald.

I cannot reach the same conclusion as to Baltas's First Amendment retaliation claims against Faucher and Brennan. Baltas's claim against Faucher stems from Baltas's allegations that Faucher placed Baltas in the RHU and issued him a false disciplinary report for falsely reporting

an incident after Baltas filed a PREA complaint, and that Faucher placed Baltas on a grievance restriction after Baltas filed a grievance about fraud and misappropriation of funds. *See* ECF No. 27 at 47. Even if the record contains sufficient evidence to satisfy the first two elements of a retaliation claim, Baltas has failed to raise a genuine dispute of material fact as to whether his grievances were "a substantial or motivating factor for the adverse actions taken by [Faucher]," *Bennett*, 343 F.3d at 137, in satisfaction of the third element.

As for the PREA complaint, the record shows that the disciplinary report for Baltas's making a false PREA complaint was well-grounded. *See* ECF No. 120-2 ¶ 20 (showing "Upheld finding of guilt on Disciplinary Ticket" for "False Reporting of an Incident (PREA)"); ECF No. 121-2 at 84 (decision upholding finding of guilt: "A pat down is within the normal course of a Correctional Officer's duties and the incident you refer to does not meet the criteria of a P.R.E.A. claim…."); ECF No. 121-2 at 45 (DOC records showing sanctions resulting from the ticket); ECF No. 123-10 ¶ 33 (Fitzgerald averring that after reviewing video of pat down, he found no evidence to support Baltas's claim of inappropriate touching). I have reviewed the video of the pat-down search and it provides zero support for Baltas's claim of sexual contact. The pat-down search occurs at 1:03:24. Baltas is in a yellow jumpsuit on the second tier in the upper left-hand corner. The pat-down search takes nine seconds. It looks like any other pat-down search. The officer does not linger over any part of Baltas's body, and after the search, Baltas does not react in any way, as someone might if inappropriately touched, but merely goes about his business. The search occurs in full view of the tier. There is an inmate sitting at a table directly across from the search, who would have been able to see everything. ECF No. 204, 21CV587Video Exhibit 26-14-Showers 7.19.198 Plaintiff Motion 199.avi, 1:03:24 (video showing pat-down search giving rise to Baltas's

PREA complaint). In short, the video supports the District Administrator's conclusion that "[t]he video footage…shows Officer Pudvah conducting a professional pat down and does not show any indication of him fondling you or acting out of his scope of duties as you claim." ECF No. 121-2 at 84.

In his objection, Baltas himself does not even describe how this search was inappropriate. *See* ECF No. 200 at 24 ("[T]he c/o's hands run across the Plaintiff's front waist, the officer's left hand goes visibly lower than his right."). In fact, he admitted to DOC officers that he did not know whether the alleged contact with his genitals was "deliberate or accidental." ECF No. 121-2 at 79. As such, I need not accept as true Baltas's unsupported allegation that the disciplinary report regarding the PREA complaint was false. Baltas further states "[w]hile the video can be deemed inconclusive, it does not demonstrate the incident did not occur by a preponderance of the evidence." *Id.* But the burden is on *Baltas* to produce evidence that controverts the facts contained in Defendants' Rule 56(a)1 statement, and he has failed to do so. *See* ECF No. 120-2 ¶ 102.

And any grievance restriction that Faucher placed Baltas on was justified under the Administrative Directives because Baltas filed more than seven grievances in a sixty-day period. *See* ECF No. 120-2 ¶ 20 (listing nine grievances filed between June 29, 2018, and August 3, 2018); ECF No. 199 at 125 (letter from Faucher indicating that Baltas was "culpable of the Administrative Directive[s]" because of the number of grievances Baltas filed). Thus, because Faucher issued Baltas a disciplinary report or placed Baltas on a grievance restriction for valid penological reasons, no reasonable jury could conclude from the record that Baltas's grievances were "a *substantial* or *motivating* factor for the adverse actions taken by [Faucher]." *Bennett*, 343 F.3d at 137 (emphasis added). Accordingly, summary judgment must enter on this claim against Faucher.

Baltas's retaliation claim against Brennan fares no better. Baltas alleges that Brennan took two retaliatory actions against him. First, he alleges that Brennan confiscated Baltas's knee braces on July 3, 2018. *See* ECF No. 1 ¶¶ 79–80. Next, he alleges that Brennan denied Baltas's "[m]edical grievances" and "medical treatments" because Baltas gave Brennan "false information." *Id.* ¶ 118 (internal quotation marks omitted). Based on these allegations, I permitted Baltas to proceed on a claim against Brennan for taking these actions in response to Baltas's filing grievances. ECF No. 27 at 47–48. Because Baltas's retaliation claim arises from two distinct sets of factual allegations, I separately consider whether any reasonable jury could find that Brennan retaliated against Baltas (1) by confiscating his knee braces or (2) by denying Baltas's medical grievances.

To the extent Baltas alleges that Brennan retaliated against him for filing grievances, grievances are protected speech, in satisfaction of the first element. *Gawlik v. Gallagher*, No. 3:25-CV-467 (OAW), 2026 WL 1802842, at *4 (D. Conn. June 23, 2026) ("Both grievances and lawsuits are considered protected speech[.]"). To the extent Baltas alleges that Brennan denied medical care to Baltas by confiscating his knee braces or denying his medical grievances, the denial of medical care is considered an adverse action, in satisfaction of the second element. *Conquistador v. Cook*, No. 3:19-CV-1471 (KAD), 2020 WL 4586513, at *4 (D. Conn. Aug. 10, 2020) (noting that "the denial of medical treatment for a period of time may be considered adverse action."). But Baltas has failed to raise a genuine dispute of material fact as to whether Baltas's grievances were "a substantial or motivating factor for the adverse actions taken by [Brennan]," *Bennett*, 343 F.3d at 137, in satisfaction of the third element.

No reasonable jury could find that Baltas's grievances were "a substantial or motivating factor," *id.*, in Brennan's confiscation of Baltas's knee braces on July 3, 2018, because Baltas's

grievances filed before that date were directed at other defendants, and Baltas points to no evidence that Brennan was aware of those grievances when she confiscated Baltas's knee braces.

"The Second Circuit as well as other district courts within the Circuit have observed that it is difficult to establish one defendant's retaliation for complaints against another defendant." *Dixon v. Lupis*, No. 3:20CV1754 (VLB), 2021 WL 4391246, at *9 (D. Conn. Sept. 24, 2021) (internal quotation marks and citation omitted). "And retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer." *Pedreira v. Pearson*, No. 3:24-CV-1875 (OAW), 2026 WL 2474685, at *7 (D. Conn. Aug. 24, 2026) (cleaned up) (citing, *inter alia*, *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claims against a correctional officer where the only alleged basis for retaliation was a complaint about a prior incident by another correctional officer)). Moreover, courts have dismissed retaliation claims where the record did not suggest that the defendant knew about grievances filed against other defendants. *See*, *e.g.*, *Jordan v. Dep't of Corr.*, No. 3:24-CV-236 (VAB), 2025 WL 1835955, at *8 (D. Conn. July 3, 2025) (dismissing First Amendment retaliation claim because plaintiff "failed to allege any non-conclusory facts showing that other staff even knew about the grievance filed against [other officers], let alone retaliated against [plaintiff] in response to it.").

Here, Baltas filed thirty-three grievances while at Corrigan. *See* ECF No. 199 at 23, 25. Of these thirty-three grievances, Corrigan officials processed only nine non-HSR grievances and two HSR grievances. ECF No. 120-2 ¶¶ 20, 29. Brennan could not have confiscated Baltas's knee braces in retaliation for Baltas's filing the HSR grievances because he filed them on July 24, 2018, ECF No. 122-4 at 2 (first HSR grievance), and August 1, 2018, ECF No. 122-4 at 5 (second HSR

grievance)—*after* Brennan confiscated Baltas's knee braces on July 3, 2018. ECF No. 1 ¶¶ 79–80; *see also Delgado v. Concepcion*, No. 3:20-CV-787 (SRU), 2020 WL 4926615, at *4 (D. Conn. Aug. 21, 2020) (plaintiff's grievances filed after alleged retaliatory conduct could not establish causal connection, in satisfaction of the third element). Thus, Brennan could only have confiscated Baltas's knee braces in retaliation for Baltas filing one of the nine non-HSR grievances that prison officials processed.

Of the nine non-HSR grievances that prison officials processed, only one pertained to medical issues, *see* ECF No. 120-2 ¶ 20 (describing grievance filed on June 29, 2018, regarding "Knee Braces and Inhaler"), such that Brennan might have become aware of the grievance in her role as the HSR coordinator. *See id.* ¶ 25 (noting Brennan's position as HSR coordinator); ¶ 31 (describing Brennan's review of Baltas's HSR grievance). But Baltas did not submit his June 29, 2018, grievance as an HSR grievance, *see id.* ¶¶ 20, 30 (listing non-HSR grievances separately from HSR grievances), and so it was not the type of grievance that Brennan would be responsible for reviewing as the HSR coordinator. *See* ECF No. 122-2 at 3 (A.D. 8.9(8)(D) describing HSR coordinator's duties as including "ensur[ing] that Health Services Review requests are properly logged and routed for evaluation and response[.]").

Rather, Baltas's June 29, 2018, grievance complained of Fitzgerald's "refusal to provide [Baltas] with [his] medically prescribed items [and] medication" and did not otherwise implicate Brennan in any wrongdoing. *See* ECF No. 121-2 at 42 (caps omitted). Faucher denied Baltas's June 29, 2018, grievance against Fitzgerald on July 2, 2018, *id.*, just one day before Brennan confiscated Baltas's knee braces. ECF No. 1 ¶¶ 79–80. But Faucher denied that grievance because

Baltas "must address these issues with medical staff, not custody [staff]." ECF No. 121-2 at 42 (caps omitted).

When Baltas later submitted his first HSR grievance to the Medical Department on July 24, 2018, he represented in it that he had made "[m]ultiple requests" to "[M]edical for 6 weeks with no responses." ECF No. 122-4 at 3. But Brennan denied this HSR grievance because she "was able only to locate one attempt made by [Baltas] on July 13, 2018[,] specific to obtaining knee braces." ECF No. 120-2 ¶ 31; *see also* ECF No. 122-4 at 3 (Brennan's denial of first HSR grievance stating that Baltas had "only written one request about this issue…. on 7/13/18" (emphasis original)); *id.* at 4 (Inmate Request Form from July 13, 2018, asking Medical Department to renew Baltas's prescription for knee braces and provide him with knee braces).

That Brennan "was able only to locate one attempt" by Baltas to obtain knee braces, ECF No. 120-2 ¶ 31, suggests that she was unaware of Baltas's June 29, 2018, grievance against Fitzgerald, and Baltas points to no evidence that she was aware of it. Because the record shows that Brennan was unaware of any grievance that Baltas filed against Fitzgerald, there is no genuine dispute as to whether Brennan confiscated Baltas's knee braces in retaliation for Baltas filing a grievance against Fitzgerald. *See*, *e.g. Ziemba v. Clark*, 167 F. App'x 831, 832 (2d Cir. 2006) (summary order) (affirming summary judgment on retaliation claim because plaintiff "fail[ed] to allege any facts to show that [nurse-defendant] even knew of [plaintiff's] lawsuits against other employees of Northern….").

No reasonable jury could find that Baltas's grievances were "a substantial or motivating factor," *Bennett*, 343 F.3d at 137, in Brennan's denying Baltas's HSR grievances, either. Like Baltas's June 29, 2018, grievance, Baltas's first and second HSR grievances implicate other prison

staff in wrongdoing. *See* ECF No. 122-4 at 3 (first HSR implicating Fitzgerald); *id.* at 6 (second HSR implicating Nurse Annette). Brennan was aware of Baltas's HSR grievances because she responded to them, *see ibid*., but her responses do not suggest any retaliatory animus. *See Jones v. Baran*, 798 F. Supp. 3d 197, 221 (D. Conn. 2025) (noting that "even where there is temporal proximity between protected conduct and an adverse action, 'some further evidence of retaliatory animus' is required before an inmate's retaliation claim may proceed to trial." (quoting *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (summary order)).

Brennan denied the first HSR grievance because, as far as she knew, Baltas misrepresented the number of requests he had made about his knee braces. *See* ECF at 122-4 at 3. Brennan denied the second HSR grievance because it was duplicative of the first. *See id.* at 6. Although Brennan warned Baltas that "[g]iving false information can be punishable with a ticket," *id.* at 3, a warning is not the same as a threat. *See*, *e.g.*, *Saraswat v. Bus. Integra, Inc.*, No. 15-CV-4680 (PKC) (LB), 2019 WL 1865193, at *9 (E.D.N.Y. Apr. 25, 2019), *aff'd sub nom. Saraswat v. Jayaraman*, 799 F. App'x 85 (2d Cir. 2020) (defendants informing alien that he could be deported if his visa was revoked was not a "threat" (cleaned up)).

At any rate, Brennan's responses to Baltas's HSR grievance do not evince the type of "retaliatory animus," *Washington*, 681 F. App'x at 46, needed to create a genuine dispute of material fact as to the third element. *See id.* (holding that summary judgment was improper where the plaintiff attested that the defendants "directly confronted him about his practice of filing grievances against prison officials before filing false misbehavior reports," which constituted "direct evidence of retaliatory animus[.]"); *Wright v. Snyder*, No. 3:21-CV-104 (SVN), 2023 WL 6379451, at *11 (D. Conn. Sept. 30, 2023) (determining that third element was disputed because,

among reasons, plaintiff alleged that "Defendant said[,] 'you think you're smart filing grievances and law suits against us,' and 'you want to watch us, well we are watching you all,' just before searching Plaintiff's cell." (brackets omitted)).

Like Baltas's retaliation claim against Faucher, there is no evidence that Baltas's grievances were "a substantial or motivating factor for the adverse actions taken by [Brennan]." *Bennett*, 343 F.3d at 137. Accordingly, summary judgment must enter on this claim against Brennan. *See Davis*, 600 F. App'x at 27 (affirming summary judgment on retaliation claim alleging that medical provider "retaliated against [inmate] for filing a grievance against her by refusing to provide [inmate] more aspirin and instructing [inmate]'s nurse to do the same" because "temporal proximity represented the sum total of [inmate's] proof—he has produced no other evidence establishing a causal connection." (internal quotation marks and citation omitted)). And because the claim against Faucher and Brennan fails on the merits, these defendants are entitled to qualified immunity. *See Palkimas*, 510 F. App'x at 65.

Because Baltas has "ma[d]e out a violation of a constitutional right," *Pearson,* 555 U.S. at 232, as to the retaliation claim against Fitzgerald, I must next consider "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* "[A] prisoner's right against retaliation for filing grievances, which was recognized in this circuit at least as early as 1988," *Rivera v. Senkowski*, 62 F.3d 80, 85 (2d Cir. 1995) (citing *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir. 1988)), was clearly established in 2018. *See id.* (right was clearly established in 1990 and 1991, when violations occurred). So was a prisoner's right against retaliation for threatening to file a lawsuit. Accordingly, Fitzgerald is not entitled to qualified immunity on this

ground. *See id.* (concluding defendants were not entitled to qualified immunity on retaliation claim).

Thus, I last consider if "officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Walczyk*, 496 F.3d at 154 (internal quotation marks and citation omitted). On this record, I conclude that "no [official] of reasonable competence could have made the same choice in similar circumstances," *Lennon*, 66 F.3d 416 at 420–21, because an inmate's right to file grievances and lawsuits had been recognized for decades before Fitzgerald took adverse action against Baltas for filing grievances and lawsuits. Accordingly, Fitzgerald is not entitled to qualified immunity on this claim. As a result, the defendants' motion is denied in part for this reason.

**viii. First Amendment Free Exercise claims against Fitzgerald and Faucher**

I permitted Baltas to proceed on a First Amendment free exercise claim based on Baltas's allegation that Fitzgerald prohibited Baltas from smudging and that, after learning of this, Faucher told Baltas that he would do nothing to remedy this situation. *See* ECF No. 27 at 50.

An inmate has a First Amendment right to freely exercise his or her chosen religion. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) ("Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." (citations omitted)). But an inmate's First Amendment rights are "[b]alanced against ... the interests of prison officials charged with complex duties arising from the administration of the penal system." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (internal quotation marks and citation omitted). Thus, an inmate's right to freely exercise his or her religion is not without limits and may be subject to restrictions related to legitimate concerns involving safety and

security. *See Pell v. Procunier*, 417 U.S. 817, 822 (1974) (a "prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.").

To state a First Amendment free exercise claim, an inmate is required to make a threshold showing "that the disputed conduct substantially burden[ed] his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274–75. If an inmate makes that showing, prison officials then "bear the relatively limited burden of identifying the legitimate penological interests that justif[ied] [their] impinging conduct[.]" *Id*. at 275. "[T]he burden remains with the prisoner to show that these articulated concerns were irrational." *Id*. (internal quotation marks and citation omitted).

Because a court is "entitled to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first," *Johnson*, 859 F.3d at 170 (bracketed material substituted) (cleaned up), I address the "clearly established" prong first because Baltas's prior cases have raised this issue. *See*, *e.g.*, *Baltas*, 153 F.4th at 332 ("*Chapdelaine*"); *Baltas v. Jones*, No. 24-100-PR, 2025 WL 3628204, at *1 (2d Cir. Dec. 15, 2025) (summary order) ("*Jones*").

As he does here, Baltas maintained in *Chapdelaine* that "prison officials denied [his] requests for 'smudging.'" *Baltas*, 153 F.4th at 341. Judge Chatigny granted the defendants qualified immunity in *Chapdelaine* "because [Baltas] presented no authority on the First Amendment right to smudging." *Id.* The Second Circuit acknowledged that "there [wa]s no clearly established right to smudging or tobacco use for religious services in prison[,]" *id.*, but nevertheless held that, at McDougal-Walker, where general population inmates participated in congregate smudging, "because Defendants failed to offer any penological justification for denying Baltas …

congregate smudging with the general population," the defendants were not entitled to qualified immunity. *Id.*

Slightly more than three months later, the Second Circuit confronted a very similar claim from Baltas: that a deputy warden "violated Baltas's First Amendment right to free exercise of his religion by forbidding him from engaging in the Native American 'smudging' ritual while in Garner's restricted housing unit ('RHU')." *Baltas*, 2025 WL 3628204, at *2. This time, the Second Circuit affirmed my grant of qualified immunity to prison officials because "it was not clearly established that prison officials would be 'unreasonable' if they prevented prisoners who had 'been deemed to present various safety and security concerns' from having 'access to a lighter' in a religious ceremony." *Id.* at *3 (record cite omitted).

The difference between *Chapdelaine* and *Jones* is the "penological justification," or lack thereof, "for denying Baltas … congregate smudging." *Baltas*, 153 F.4th at 341; *see also Baltas*, 2025 WL 3628204, at *3. Here, "[t]he classification and disciplinary history of an inmate dictated whether an inmate c[ould] participate in smudging outside or participate in dry smudging in his cell." ECF No. 120-2 ¶ 99. Prison officials determined the "classification … of an inmate," *id.*, based on whether the inmate "posed a threat to the security and orderly operation of a facility, or a risk to the safety of staff or other inmates due to repetitive disciplinary infractions," *id.* ¶ 51 (Chronic Discipline), or whether the inmate "posed a threat to the safety and security of the facility, staff, inmates, or the public." *Id.* ¶ 54 (High Security). Because of Baltas's "classification and disciplinary history, only dry smudging would be available" to him. *Id.* ¶ 99.

Unlike in *Chapdelaine*, where the defendants "failed to offer any penological justification for denying Baltas … congregate smudging with the general population," *Baltas*, 153 F.4th at 341,

the defendants here, as in *Jones*, have provided such a "penological justification" because Baltas, as a Chronic Discipline and High Security inmate, posed a security threat and a danger to those around him. *See* ECF No. 120-2 ¶¶ 51, 54. Baltas argues that prison officials may not deny an inmate congregate religious services "simply and only on the basis of…classification" and asserts that "[i]ndividualized determinations of the necessity of their exclusion is required." ECF No. 199-1 at 25 (quoting *Mawhinney v. Henderson*, 542 F.2d 1, 3 (2d Cir. 1976)). The language he quotes from *Mawhinney*, however, appears nowhere in the decision; nor does the case support the proposition that classification may not be a legitimate penological justification for denying access to religious services. In *Mawhinney*, the court stated that "not every prisoner in segregation can be excluded from chapel services; because not all segregated prisoners are potential troublemakers, the prison authorities must make some discrimination among them." 542 F.2d at 3. The court held that Mawhinney had stated a claim because he had alleged that "inmates in punitive segregation and keeplock at Auburn are routinely denied participation in chapel services without any determination as to the necessity of their exclusion." *Id.* Here, by contrast, Baltas was placed on two statuses that, by definition, applied only to "potential troublemaker[s]," 547 F.2d at 3, i.e., chronic discipline and high security. Indeed, as shown above, Baltas was apparently the only inmate at Corrigan to be on both statuses (or at least he has not identified anyone else who was). His placement on these statuses meant that DOC officials had made an individualized determination that he posed a safety and security threat to staff, other inmates, and the public. This was a legitimate penological justification for denying him access to religious services that involved the use of fire. *See Bellamy v. McMickens*, 692 F.Supp.205, 214-15 (S.D.N.Y. 1988) ("Prohibiting prisoners' attendance at religious services because they are confined to administrative segregation

is not a violation of the First Amendment since it serves an obvious, legitimate penological objective").

As such, for the reasons the Second Circuit stated in *Jones*, 2025 WL 3628204, at *3, the defendants are entitled to qualified immunity on this claim. *See id.*

**C. Exhaustion of Administrative Remedies**

Baltas's First Amendment retaliation claim against Fitzgerald has survived the defendants' merits and qualified immunity challenges. But because the defendants maintain that Baltas's "claims of retaliation were not exhausted as to cell searches," ECF No. 120-1 at 14, I must next consider whether Baltas exhausted his First Amendment retaliation claim against Fitzgerald.

**i. General Principles of Exhaustion**

The Prison Litigation Reform Act ("PLRA") requires a prisoner pursuing a federal lawsuit to exhaust all available administrative remedies for each claim the prisoner brings in a section 1983 suit. *See* 42 U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted"). "The PLRA mandates that inmates in correctional facilities exhaust administrative remedies before filing suit under Section 1983." *Dublino v. Biegaj*, No. 22-198-PR, 2024 WL 390866, at *1 (2d Cir. Feb. 2, 2024) (summary order). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion," meaning that the inmate must use all steps required by the administrative review process applicable to the institution in which he is confined, and do so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out and doing so properly"). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96; *see also Jones*, 549 U.S. at 211. Moreover, prisoners "cannot satisfy the PLRA's exhaustion requirement solely by ... making informal complaints" to prison officials. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007).

Because the failure to exhaust administrative remedies is an affirmative defense, *see Jones*, 549 U.S. at 216, the defendant "bear[s] the initial burden of establishing ... that a grievance process exists and applies to the underlying dispute[.]" *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015). "Once the defendant provides reliable evidence that administrative remedies were not exhausted before the plaintiff commenced the action, the plaintiff must present evidence showing that he did exhaust his administrative remedies or establish that administrative remedy procedures were not available to him." *Saunders v. Jarrin*, No. 24-CV-54 (SFR), 2025 WL 2783581, at *5 (D. Conn. Sept. 30, 2025).

An inmate's failure to exhaust administrative remedies is only excusable if the remedies are in fact unavailable. *See Ross*, 578 U.S. at 635. "Availability" in this context means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* at 642 (internal quotation marks and citations

omitted). In *Ross*, the Supreme Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 643–44.

First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643. "Next, an administrative remedy scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 644. "[T]he three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2. In considering the issue of availability, however, the court is guided by these illustrations. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (citing *Williams*, 829 F.3d at 123 n.2).

**ii. Exhaustion of administrative remedies under DOC Administrative Directives**

The DOC "requires inmates to submit grievances in accordance with Administrative Directive 9.6 ('A.D. 9.6')," which provides procedural rules and deadlines for processing general inmate requests. *Riles*, 656 F. App'x at 579. "Courts look to the version of A.D. 9.6 that was in effect at the time of the events in question." *Nicholson v. Mackenzie*, No. 3:22-CV-01165 (VDO), 2026 WL 457547, at *4 (D. Conn. Feb. 18, 2026).

Because Baltas's allegations stem from events that occurred while Baltas was housed at Corrigan between June and September of 2018, *see generally* ECF No. 1, I look to the version of

the Administrative Directives that was in effect then. The defendants have submitted the appropriate version of A.D. 9.6 with their motion. *See* ECF No. 121-2 at 9–22 (A.D. 9.6, with effective date of August 15, 2013).

The "Inmate Grievance Procedure" is set forth in A.D. 9.6(6). *See id.* Under A.D. 9.6(6), an inmate must "attempt to seek informal resolution prior to filing an inmate grievance." A.D. 9.6(6)(A). If "the inmate is not satisfied with the informal resolution offered[,]" the inmate may file a grievance using a CN 9602 form. A.D. 9.6(6)(C), (18)(B). Grievances may be either "Rejected, Denied, Compromised, Upheld or Withdrawn." A.D. 9.6(6)(D). Grievances may also be "returned without disposition" if an inmate fails to "attempt informal resolution," fails to "adequately explain why a response to CN 9601, Inmate Request Form, is not attached," or fails to "comply with the provisions of Section 5(E)(1-5) of this Directive." A.D. 9.6(6)(E). An inmate may appeal a rejected or denied grievance using a CN 9604 form. A.D. 9.6(6)(G), (18)(D). An inmate may refile a grievance "returned without disposition" after "the inmate has corrected the error." A.D. 9.6(6)(E). An appeal of a rejected or denied grievance is "the final level of appeal for all grievances" subject to some exceptions not applicable here. *See* A.D. 9.6(6)(K)–(L). Thus, a claim is considered exhausted if an inmate has pursued a claim through "the final level of appeal." A.D. 9.6(6)(K); *see also Roseboro v. Faucher*, No. 3:21-CV-569 (VAB), 2023 WL 1928107, at *7 (D. Conn. Feb. 10, 2023) ("[A]n inmate who properly appeals to Level 2 typically satisfies the PLRA's exhaustion requirement.").

Prison officials may deem an inmate to have "abus[ed] the grievance procedure" if, among other reasons, "an inmate files more than seven (7) grievances in any 60[-]day calendar period[.]" A.D. 9.6(6)(O). If the Unit Administrator deems the inmate to have abused the grievance

procedure, the inmate may face certain filing restrictions, including "(a) total denial of access to the grievance procedure; (b) a limitation on the number of grievances that may be filed; and, (c) a restriction as to the subject matter that may be grieved." *Id.* "A determination of abuse may be appealed to the appropriate District Administrator." *Id.*

**iii. Baltas's exhaustion of his First Amendment retaliation claims under A.D. 9.6**

Here, Baltas's "personal grievance log" (ECF No. 196 at 13 ¶ 4) shows that, on July 1, 2018, he filed a grievance related to "retaliation." ECF No. 199 at 23. But unlike the other grievances that Baltas pursued through the prison's appellate process, *see* ECF No. 120-2 ¶ 20, this grievance does not contain a receipt and case number. *Compare id.*, *with* ECF No. 199 at 23. The retaliation grievance shows a "RWD 001" annotation next to it. *See* ECF No. 199 at 23. Absent further explanation, I presume that "RWD" means "Returned Without Disposition." *See*, *e.g.*, *Baltas v. Dones*, No. 3:22-CV-00038 (MPS), 2025 WL 2699224, at *5 (D. Conn. Sept. 23, 2025) (noting DOC captain's testimony that grievance "marked 'RWD 121' … meant 'returned without disposition.'" (comma omitted)).

According to the Administrative Directives, "[r]eturned without disposition signifies that the grievance has not been properly filed and may be re-filed after the inmate has corrected the error." A.D. 9.6(6)(E). Indeed, Faucher's July 10, 2018, letter states that the "nine (9) CN9602 Inmate Administrative Remedies" that DOC received on July 2, 2018, "does not include the eight [grievances] [Baltas] submitted that are being returned without disposition due to process failure." ECF No. 199 at 125.

As courts have recognized, "[n]either Directive 9.6(6)(E) nor CN 9606, the form DOC uses to return incorrectly filed grievances to an inmate, provides a deadline or time limit to correct the error and resubmit the grievance." *Quigley v. Rivera*, No. 3:19-CV-482 (KAD), 2023 WL 1801228, at *5 (D. Conn. Feb. 7, 2023) (footnote omitted). But neither Baltas's grievance log nor DOC's records show that Baltas ever corrected the procedural deficiencies that caused these grievances to be returned without disposition or that Baltas submitted new, compliant grievances related to retaliation. *See* ECF No. 120-2 ¶ 20; ECF No. 199 at 23, 25. Accordingly, the undisputed evidence shows that Baltas did not exhaust his administrative remedies as to his First Amendment retaliation claims by filing a grievance using a CN 9602 form, A.D. 9.6(6)(C), (18)(B), and then by appealing the rejection or denial of the grievance using a CN 9604 form. A.D. 9.6(6)(G), (18)(D). As such, Baltas failed to exhaust his administrative remedies on his First Amendment retaliation claims against Fitzgerald. *See*, *e.g.*, *Baltas*, 2025 WL 2699224, at *16 (finding that "the plaintiff failed to file the necessary corrected grievances or appeals to exhaust his administrative remedies.").

**iv. Unavailability of administrative remedies**

Because the record shows that Baltas's First Amendment claims against Fitzgerald are unexhausted, I must next examine whether Baltas has proven that administrative remedies were unavailable to him under the circumstances described by, or similar to, *Ross. See Saunders*, 2025 WL 2783581, at *5. Baltas must prove this with admissible evidence, *see Bellamy*, 914 F.3d at 750, not assertions or arguments contained in his opposition papers. *See Langer v. 121 Inflight Catering, LLC*, No. 3:14-CV-00861 (MPS), 2016 WL 868156, at *1 (D. Conn. Mar. 7, 2016)

(noting that "[w]hile [plaintiff] makes several assertions of fact in his memoranda, arguments in memoranda are not evidence.").

As to the first *Ross* circumstance, the record evidence does not show that the administrative remedy process at Corrigan "operate[d] as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 578 U.S. at 643. An officer is "unable" to provide relief if "the relevant administrative procedure lacks authority to provide any relief[.]" *Id.* (internal quotation marks and citation omitted). And an officer is "unwilling" to provide relief "if administrative officials have apparent authority, but decline ever to exercise it." *Id.* In contrast, an administrative remedy process is not a dead end so long as it provides "the possibility of some relief." *Id.* (internal quotation marks and citation omitted).

Here, the record contains no evidence that prison's grievance procedure operated as a "dead end," as described by *Ross*. Baltas filed eight grievances in a three-day period. ECF No. 120-2 ¶ 20. While Faucher denied all but one of those grievances, *see id*. ¶ 71, an administrative remedy process does not "operate[ ] as a simple dead end," *Ross*, 578 U.S. at 643, merely because Faucher denied most of Baltas's grievances. *See Perez v. Barone*, No. 3:20-CV-1261 (MPS), 2021 WL 2206569, at *3 (D. Conn. June 1, 2021) (that plaintiff's "grievance was ultimately denied does not show that correctional officials are unable or consistently unwilling to provide any relief to aggrieved inmates.").

The one grievance that Faucher did not deny was "compromised," ECF No. 120-2 ¶¶ 20, 71, meaning that Baltas received at least some partial relief by filing the grievance. *See* A.D. 9.6(3)(C). This shows that Faucher was not "unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 578 U.S. at 643; *see also Williams v. Sposato*, No. 13-CV-4247, 2019

WL 5310222, at *8 (E.D.N.Y. Oct. 21, 2019) (concluding that the grievance procedure did not operative as a dead end because the plaintiff "either received the relief he sought, or other appropriate relief which he accepted, for the four (4) grievances he submitted prior to commencing this action."). And it shows "the possibility of some relief." *Ross*, 578 U.S. at 643 (internal quotation marks and citation omitted).

Although the Second Circuit has not considered whether a grievance restriction renders a grievance procedure a dead end, *see Lopez v. McGill*, No. 308-CV-01931CSH, 2009 WL 179787, at *5 (D. Conn. Jan. 21, 2009) (noting that whether "administrative remedies are unavailable where the inmate has been placed on grievance restriction …. has not been reached in the Second Circuit[.]"), it has held that an inmate's transfer to a psychiatric facility rendered the prison's administrative remedy process a dead end because the inmate was "unable to file any grievance against DOCCS" even though he was within the time limit for filing a grievance. *See Romano v. Ulrich*, 49 F.4th 148, 156 (2d Cir. 2022). Thus, if a grievance restriction rendered an inmate "unable to file *any* grievance against [DOC officials]," *id.* (emphasis added; bracketed material substituted), it may render the administrative remedy process a dead end under *Romano* and *Ross*. *See id.* But the record here does not show, as it did in *Romano*, that Baltas was "unable to file *any* grievance against [DOC officials]," *id.* (emphasis added; bracketed material substituted), for two reasons.

First, Baltas could have filed a grievance related to his retaliation claim before Faucher placed any grievance restriction on him. Fitzgerald threatened Baltas and ordered officers to search Baltas's cell on June 27, 2018. ECF No. 1 ¶¶ 56, 57(b). Faucher did not write his letter informing Baltas that his grievance "restriction will be increased to one grievance per month and extended

six months through May 11, 2019" until July 23, 2018. *See* ECF No. 199 at 129. Thus, to the extent a grievance restriction would have restricted Baltas's ability to grieve Fitzgerald's act of retaliation, Baltas had twenty-six days to file that grievance before any grievance restriction went into effect.

Second, even if some grievance restriction was in place after Baltas could either still file a grievance or after Fitzgerald retaliated against Baltas, the grievance restriction that Faucher indicated he *would* impose if Baltas continued to abuse the grievance process still permitted Baltas to file "one grievance per month …." ECF No. 199 at 129. Thus, Baltas could have used that one grievance to grieve any incidents of retaliation after Faucher's grievance restriction went into effect. *See*, *e.g.*, *Seiler v. Semple*, No. 3:17-CV-71 (AWT), 2018 WL 3935033, at *4 (D. Conn. Aug. 16, 2018) (grievance restriction that permitted inmate to file only one grievance per month did not render grievance procedures unavailable to him because he "could have elected to use his August grievance to address this issue[.]").

As to the second *Ross* circumstance, the record does not show that Corrigan's administrative remedy process was "so opaque that it becomes, practically speaking, incapable of use." *Ross*, 578 U.S. at 643. The Second Circuit has recognized Connecticut DOC Administrative Directives as "rigorous in some respects," but "not so opaque as to be unavailable[.]" *Riles*, 656 F. App'x at 581. Indeed, the administrative remedy scheme was clear enough for Baltas to file thirty-three grievances while at Corrigan. *See* ECF No. 199 at 23, 25.

But as to the third *Ross* circumstance, there *is* a genuine dispute of material fact as whether administrative remedies were unavailable due to "prison administrators thwart[ing] inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, 578 U.S. at 644. "To determine whether a grievance process has been rendered 'unavailable' through 'threats or other intimidation by prison officials,' [a court] consider[s] whether the intimidating acts 'would have deterred a similarly situated individual of ordinary firmness from utilizing the grievance procedures.'" *Baltas*, 119 F.4th at 267 (quoting *Lucente*, 980 F.3d at 312–13). "Such threats and intimidation must occur 'in connection with the grievance process itself.' " *Id.* (quoting *Lucente*, 980 F.3d at 312). While "acts of intimidation need not be tied narrowly to a particular grievance, they cannot be wholly unrelated to the grievance process." *Scott v. Cambisi*, No. 20-CV-6388MWP, 2024 WL 867102, at *11 (W.D.N.Y. Feb. 29, 2024) (cleaned up). As a result, "a generalized fear of retaliation" is "insufficient as a matter of law to support a finding that the grievance process was unavailable…." *Lucente*, 980 F.3d at 312.

The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (describing *Davis,* 320 F.3d at 353). "At summary judgment, Baltas [i]s entitled to rely on his own testimony to establish that [DOC]'s grievance process was unavailable to him in order to overcome his failure to exhaust administrative remedies under the PLRA." *Baltas*, 119 F.4th at 267.

The Second Circuit recently held in *Baltas v. Maiga* that a prison's grievance system was unavailable to Baltas because "[i]n two sworn affidavits, Baltas identified specific individuals who made specific threats to Baltas, warning him not to complain or file a grievance with VADOC." *Baltas*, 119 F.4th at 267, 269. Even though "Baltas nevertheless proceeded to grieve his complaints about ROSP staff and conditions in Virginia directly to CTDOC officials in Connecticut," *id.* at 268, the Second Circuit concluded that "Baltas's decision to bypass VADOC's internal grievance

system and grieve instead with CTDOC does not undermine his claim that he was thwarted from taking advantage of a grievance process through intimidation." *Id.* at 268–69 (cleaned up) (quoting *Lucente*, 980 F.3d at 311). Accordingly, the Second Circuit held that I "erred in concluding that, on this record, the VADOC grievance process was available to Baltas as a matter of law." *Id.* at 269.

Here, as in *Maiga*, Baltas has also "identified specific individuals who made specific threats to Baltas, warning him not to complain or file a grievance with [DOC]." *Id.* at 267 (bracketed material substituted). For instance, on June 27, 2018, Fitzgerald became "furious" after Baltas told Fitzgerald that Baltas was filing a lawsuit. ECF No. 1 ¶¶ 56, 57(a). Fitzgerald told Baltas that Baltas "had already 'been warned' and that he would make [Baltas's] 'life hell.'" *Id.* ¶ 57(a). Approximately two weeks later, on July 10, 2018, Faucher delivered a memorandum to Baltas notifying Baltas that Faucher had placed Baltas on a grievance restriction for filing too many grievances. *Id.* ¶ 87. As Faucher delivered the memorandum to Baltas, Faucher "expressly threatened [Baltas][,] stating that if he continued 'complaining or making waves[,] what he's experienced so far will be nothing to the shit storm Faucher w[ould] rain down on him.'" *Id.* ¶ 88 (original brackets omitted).

Although Fitzgerald's statements related to Baltas's lawsuit were "unrelated to the grievance process" *per se*, *Scott*, 2024 WL 867102, at *11, such that they may have produced only "a generalized fear of retaliation," in Baltas, *Lucente*, 980 F.3d at 312, the statements that Faucher made after delivering the grievance restriction memorandum to Baltas were made "in connection with the grievance process itself." *Id.*

The record shows that Baltas "proceeded to grieve his complaints," *Baltas*, 119 F.4th at 268, despite Faucher's threats. *See* ECF No. 199 at 23, 25 (grievance log showing Baltas's grievances filed after July 10, 2018). But, under *Maiga*, it would be error to conclude that administrative remedies were available to Baltas simply because he continued to file grievances after Faucher threatened him. *See Baltas*, 119 F.4th at 269. Accordingly, although Baltas did not exhaust his administrative remedies on his First Amendment retaliation claim against Fitzgerald, I nevertheless conclude that a genuine dispute of material fact exists as to whether administrative remedies were unavailable to Baltas under the third circumstance described by *Ross*. *See id.*; *see also Perttu v. Richards*, 605 U.S. 460, 468 (2025) (holding that "parties have a right to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim that falls under the Seventh Amendment."). Accordingly, summary judgment is denied on this ground.

## VI. CONCLUSION

For the foregoing reasons, the motion for summary judgment is **GRANTED** on Baltas's Eighth Amendment, Fourteenth Amendment, and First Amendment Free Exercise claims against Fitzgerald, Faucher, and Brennan. The motion for summary judgment is **DENIED** on Baltas's First Amendment retaliation claims against Fitzgerald. The Clerk is directed to terminate Faucher and Brennan as defendants in this action.

**SO ORDERED** this 24th day of September 2026 at Hartford, Connecticut.

/s/
Michael P. Shea
United States District Judge